[No. B073734. Second Dist., Div. Six. June 13, 1994.]

MARCUS RUDNICK, Plaintiff and Respondent, v.
IRV McMILLAN, Defendant and Appellant.

**COUNSEL**

Roy A. Hanley for Defendant and Appellant.

Carol A. Sobel and Paul L. Hoffman as Amici Curiae on behalf of Defendant and Appellant.

William H. McKenzie for Plaintiff and Respondent.

## OPINION

**GILBERT, J.**—Letters written to the editor of a magazine or a newspaper are often like elaborate costume parties. Fact and opinion disguise their identities and pose as one another. Like the invitees at such affairs, the average reader is seldom deceived by the masquerade.

Here we consider a letter to the editor of a newspaper. The letter is alleged to be defamatory. The letter contains statements of opinion which assume the appearance of fact in circumstances which reveal to the average reader the statements' true character. We hold, among other things, these statements are not defamatory.

Defendant Irv McMillan appeals from the judgment after a jury found that he libeled plaintiff, Marcus Rudnick. The trial court instructed the jury to determine by a preponderance of the evidence whether a letter McMillan wrote to a newspaper contained the false assertion of a fact causing injury to Rudnick.

Because Rudnick is a "limited purpose public figure," such instructions are erroneous. In a libel case involving a public figure, a jury must find by clear and convincing evidence that the defendant published the false assertion of a fact with knowledge of its falsity or with reckless disregard for its truth. (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706-707, 84 S.Ct. 710, 95 A.L.R.2d 1412]; *Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 510 [115 L.Ed.2d 447, 468, 111 S.Ct. 2419].) Moreover, because the alleged defamatory statements in the letter, taken as a whole, and in the circumstances in which they were made, are opinion, we reverse.

### FACTS

### *Before McMillan's Letter*

Rudnick's father and another man ran the MU ranch on the Carrizo plain in San Luis Obispo between 1935 and 1946. When his father started cattle grazing on the MU, the grassland and shrubbery were in fairly good condition. Rudnick has been a cattle rancher since 1935. In 1951, Rudnick purchased a large part of the MU ranch and continued cattle ranching there. Before the present controversy arose, about half of the MU ranch area was owned by the Bureau of Land Management. This area, however, is not fenced or marked. Through 1990, the Bureau of Land Management (BLM) sold permits to Rudnick allowing him to graze cattle on public areas of the ranch.

The BLM announced plans to suspend cattle grazing in 1991. In October 1991, Rudnick sold his portion of the ranch to the Nature Conservancy and he signed a livestock use agreement (LUA) which required him to abide by the grazing rules set forth by the Nature Conservancy to preserve the land. Rudnick knew that the Nature Conservancy, and the BLM, were making the area a nature preserve, and the LUA states that its purpose was to "protect[ ] endangered species and [to] restor[e] the native flora and fauna."

The LUA permitted livestock grazing only for limited periods during winter, subject to the existence of minimum mulch levels. Rudnick expected to be allowed to graze his cattle starting December 1, 1991. Shortly before December 1, the Nature Conservancy told Rudnick he could not start grazing on that date. This upset Rudnick. He decided it was important for the public to consider whether the BLM and the Nature Conservancy were mismanaging this land.

He asked Lee Pitts, editor of a trade publication called the Livestock Market Digest, to visit the ranch. Rudnick hoped Pitts would write an article on the condition of the Carrizo. Pitts visited the ranch, wrote an article about it entitled *This Dying Ground* and sent Rudnick a draft for editing. Rudnick liked what Pitts wrote and sent it back with minor corrections. Pitts published it on November 18, 1991.

The article stated, inter alia, that "the Nature Conservancy, the B.L.M. and several other agencies started buying up the . . . lands to preserve them. [¶] [A]ll that is visible for miles are tumbling tumbleweeds. The land is clearly dying." The article continued by stating that "up until one month ago, it was managed by a rancher with a lifelong history of knowing what is best for these plains." The article stated that Rudnick recalled driving cattle across the MU "as far back as 1936. Buying the ranch in 1950 was a dream come true for him."

"The howling wind tells the story. Through the private lands ranch, the grass sways in the wind. Through the Carrizo plains preserve, the wind whips the tumbleweeds like a spreading disease, killing the country as they roll."

Dick Nock, a columnist for the San Luis Obispo Telegram-Tribune, read Pitts's article and asked Rudnick for a tour of the ranch. On December 20, 1991, after Rudnick gave Nock a tour of the ranch, Nock published an article about it. He wrote that Rudnick purchased the MU in 1963, and that the Nature Conservancy in conjunction with the BLM recently purchased Rudnick's interest in the ranch. He reported that Rudnick had never seen such a prolific crop of tumbleweeds in his 60-year association with the ranch.

*McMillan's Letter*

After McMillan read both articles, he wrote the subject letter to the editor of the Telegram-Tribune. The letter was published on January 2, 1992. It states: "Dick Nock's Dec. 20 column, 'Nature groups slowly destroying county,' explains and advocates the land use philosophy that has converted vast areas of our public domain to barren wastelands.

"When Marcus Rudnick bought the MU Ranch in 1936 it was covered by a shrub grassland that fattened livestock and supported an abundance of wildlife. When I visited the MU and adjoining BLM holdings in December 1990, cattle dung was all that remained to protect the soil and the only wildlife species were those that lived underground. The winds had been and continued to blow tons and tons of soil from this denuded range.

"This windswept land furnished an ideal environment for the alien tumbleweed to germinate and grow. When the miracle rains of March 1991 fell, the tumbleweeds flourished and covered the land like a scar protects a wound.

"Now, Mr. Nock and Mr. Rudnick are blaming 'nature groups' for the blanket of tumbleweed that covers the MU and thousands of other acres on the Carrizo plain. They seem oblivious to the reality that past land use practices have resulted in this dismal stage of degradation.

"It is disappointing that Dick Nock, the voice of agriculture in San Luis Obispo County, espouses the continuation of this cycle of depletion. Is it any wonder that cows are no longer welcome on our public lands?

"Hats off to the BLM and Nature Conservancy for their attempts to reverse the decades of land misuse on the Carrizo Plain."

*After McMillan's Letter*

Rudnick read this letter and invited McMillan to tour the ranch again. After McMillan did so, Rudnick asked him to issue a letter retracting his statements. McMillan refused to do so and Rudnick filed the instant complaint for libel on March 4, 1992.

Rudnick alleged that the following quotes from McMillan's letter are untrue about him: 1. "When Marcus Rudnick bought the MU Ranch in 1936 it was covered by a shrub grassland that fattened livestock and supported an abundance of wildlife." 2. "When I visited the MU and adjoining BLM

holdings in December 1990, cattle dung was all that remained to protect the soil and the only wildlife species were those that lived underground. The winds had been and continued to blow tons and tons of soil from this denuded range." 3. "This windswept land furnished an ideal environment for the alien tumbleweed to germinate and grow." 4. "Now Mr. Nock and Mr. Rudnick are blaming 'nature groups' for the blanket of tumbleweed that covers the MU . . . . They seem oblivious to the reality that past land use practices have resulted in this dismal state of degradation."

Rudnick alleged that the truth was: 1. He purchased the ranch in 1951 after a seven-year drought which had left the range in very poor condition; 2. there were no tumbleweeds on the ranch in 1990 except on the southwest end of the MU, although there had been some soil erosion due to extremely high winds; 3. when McMillan toured the ranch in 1992, grass covered the same area which had been previously windswept, and 4. the ranch is in good condition and has been well-managed by Rudnick.

The complaint alleged that McMillan knowingly wrote these untrue statements with actual malice, injuring him in his occupation as a cattle rancher.

The trial court instructed the jury that Rudnick had the burden of proving by a preponderance of the evidence that McMillan's letter contained a false assertion of a fact which an average reader would find injurious to Rudnick. The jury found for Rudnick and awarded him damages of $32,500 ($1 per circulated weekday issue of the Telegram-Tribune). The trial court entered judgment and this appeal ensued.

DISCUSSION

I

McMillan asserts that for the purposes of this action, Rudnick is a limited purpose public figure and that the trial court failed to instruct accordingly.

In *New York Times Co.* v. *Sullivan, supra,* 376 U.S. at pages 279-280 [11 L.Ed.2d at page 706], the United States Supreme Court held that when public officials are sued for libel they must prove by clear and convincing evidence that the defamatory statement is "made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

In *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 351 [41 L.Ed.2d 789, 811-812, 94 S.Ct. 2997], the United States Supreme Court extended the

reach of *Sullivan* to "public figures," which include individuals who "voluntarily inject[] [themselves] or [who are] drawn into a particular public controversy . . . ." Such people become " 'limited purpose' public figure[s]" who lose some protection regarding their reputation "to the extent that the allegedly defamatory communication relates to his role in a public controversy." (*Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 253-254 [208 Cal.Rptr. 137, 690 P.2d 610].) Whether or not one is a limited purpose public figure is a question of law for courts to decide. (*Id.* at p. 252.)

To qualify as a limited purpose public figure, a plaintiff "must have undertaken some *voluntary* [affirmative] act[ion] through which he seeks to influence the resolution of the public issues involved." (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 254, fn. omitted.)

A plaintiff can do so by discussing the matter with the press or by being quoted by the press, thus thrusting himself into the vortex of a public issue. (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. 323, 352 [41 L.Ed.2d 789, 812-813].) A defendant need not show, however, that the plaintiff himself made the statements which resulted in the public controversy. (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 255.) A plaintiff's attempts to thrust himself into the public eye are sufficient. (*Ibid.*) Accordingly, courts consider "the nature and extent of an individual's participation in the particular controversy . . ." in deciding whether a plaintiff is a limited purpose public figure. (*Gertz, supra,* 418 U.S. at p. 352 [41 L.Ed.2d at pp. 812-813]; *Wolston* v. *Reader's Digest Assn. Inc.* (1979) 443 U.S. 157, 167 [61 L.Ed.2d 450, 460, 99 S.Ct. 2701].)

■ In the instant case, Rudnick thrust himself into the public eye by expressing to publisher Lee Pitts his concerns over the publicly held preserve. He asked him to visit the area in the belief that Pitts would publish an article blaming the Nature Conservancy and the BLM for ruining land Rudnick had grazed for 40 years. Pitts wrote such an article and Rudnick edited it for publication. Rudnick also encouraged Nock to visit the ranch. Rudnick was aware that Nock wrote articles for the Telegram-Tribune. He hoped Nock would write an article similar to the Pitts article. It was the publication of the two articles which prompted McMillan to write his letter to the editor.

Rudnick made himself into a limited purpose public figure. Assuming that McMillan's statements were defamatory and actionable, he may not be held to have libeled Rudnick unless a jury finds by clear and convincing evidence that he wrote his letter either with knowledge that it contained a false

statement of fact or with reckless disregard for whether his assertions were true or false. (*New York Times Co. v. Sullivan, supra,* 376 U.S. at pp. 279-280 [11 L.Ed.2d at pp. 706-707]; *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at p. 351 [41 L.Ed.2d at pp. 811-812].)

## II

■ Although reversal is required because the trial court failed to instruct the jury on actual malice, we do not remand for retrial. McMillan's letter to the editor is an opinion which is not actionable for libel.

■ "The crucial question in this case is whether the statement at issue was a statement of fact or a statement of opinion. This is a question of law to be decided by the court. [Citations.]" (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87].) "The distinction frequently is a difficult one, and what constitutes a statement of fact in one context may be treated as a statement of opinion in another, in light of the nature and context of the communication taken as a whole." (*Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601 [131 Cal.Rptr. 641, 552 P.2d 425].)

"California courts have developed a 'totality of the circumstances' test to determine whether an alleged defamatory statement is one of fact or of opinion." (*Baker v. Los Angeles Herald Examiner, supra* 42 Cal.3d 254, 260.) We first consider how the words at issue are phrased. Next, we consider the context in which the statement was made. This includes the facts surrounding the publication, the nature and full content of the statement and the knowledge and understanding of the audience to whom the publication was directed. (*Id.,* at pp. 260-261.) In short, we must determine whether the average reader of the Telegram-Tribune's letters to the editor could have reasonably understood the letter at issue to be factual in nature. (*Id.* at p. 261.)

A statement couched in language often used to express an opinion is not necessarily dispositive because such verbiage may constitute or imply the false assertion of fact, thereby causing damage to one's reputation. (See *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 18-19 [111 L.Ed.2d 1, 17-18, 110 S.Ct. 2695].)

But, ". . . where potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which

generally might be considered as statements of fact may well assume the character of statements of opinion." (*Gregory* v. *McDonnell Douglas Corp.*, *supra*, 17 Cal.3d 596, 601.)

"[S]hort of accusations of crime or personal dishonesty, the First Amendment protects even sharp attacks on the character, motives, or moral qualifications of 'a public officer or . . . active participant in a labor dispute.' " (*Okun* v. *Superior Court* (1981) 29 Cal.3d 442, 451 [175 Cal.Rptr. 157, 629 P.2d 1369].) "There is an analogous leeway for criticism of an individual who voluntarily injects himself or herself into public controversy and so becomes a 'public figure.' [Citation.]" (*Ibid.*)

■ To decide whether the letter at issue here today is actionable for libel, we place ourselves in the position of the intended reader and determine the sense or meaning of the letter ". . . according to its natural and popular construction" and apply the totality of the circumstances test to it. (*Baker* v. *Los Angeles Herald Examiner, supra*, 42 Cal.3d 254, 260.)

Here, McMillan's letter to the editor refers to Nock's newspaper column as explaining and *advocating* a land-use "philosophy" which has ". . . converted vast areas of our public domain to barren wastelands." Such language tells the reader that McMillan has a strong opinion which differs from Nock's opinion.

McMillan's letter continues by making the general, broad comments that nearly 50 years ago the ranch Rudnick purchased was "covered" by grassland and supported "an abundance of wildlife." McMillan stated that he viewed the ranch in 1990, more than two years before he wrote his letter, and that "cattle dung was all that remained to protect the soil and the only wildlife species were those that lived underground."

Although this language seems factual, in the circumstances in which it appears, and the manner in which it is expressed, it assumes the character of opinion and hyperbole. In the context in which the statements are made, the average reader would regard them as opinion and not as statements of fact.

The next paragraph of McMillan's letter reinforces this view. It states "This windswept land furnished an ideal environment for the alien tumbleweed to germinate and grow. When the miracle rains of March 1991 fell, the tumbleweeds flourished and covered the land like a scar protects a wound." Phrases such as "ideal environment," "miracle rains," "tumbleweeds flourished," and "covered the land like a scar protects a wound," also read more like ornate phrases and rhetorical hyperbole than they do like

unadorned specific facts. McMillan had already told the reader that he viewed the land in 1990, not 1991.

Advocacy, hyperbole and generality also mark the end of McMillan's letter. He opines that Nock and Rudnick are "blaming 'nature groups' for the blanket of tumbleweeds that cover the MU and thousands of other acres . . . . They seem oblivious to the reality . . . ." McMillan decries Nock's "espousal" of "this cycle of depletion," and with more than a touch of sarcasm asks "Is it any wonder that cows are no longer welcome on our public lands?" McMillan then praises the BLM and the Nature Conservancy for their efforts to reverse "decades of land misuse."

Letters to the editor are typically laden with literary license for the purpose of expressing one's opinion. In *Okun* v. *Superior Court, supra,* 29 Cal.3d 442, a letter to the editor regarding a controversial land exchange between a city and a developer which sought "to set the record straight" was held to be opinion despite its assertion of specific information about the exchange. (At p. 448.) Our Supreme Court held that "A contrary ruling would inhibit a significant segment of the discourse vital in a democracy. [Citations.]" (*Id.,* at p. 451.)

In *Baker* v. *Los Angeles Herald Examiner, supra,* 42 Cal.3d 254, 267-268, the Supreme Court held that a review of a television program in an editorial column was an unactionable opinion. Our Supreme Court explained that "Columns by movie or television critics, like columns or articles which appear in the opinion-editorial pages of newspapers, are 'the well-recognized home of opinion and comment.' [Citations.]" Ordinary readers of letters to the editor could not reasonably understand McMillan's letter to be libelous to Rudnick.

McMillan wrote this letter in response to editorial comments about public land use in an era of increasing concern about land-use practices and the environment. McMillan's letter was a response to articles that expressed another point of view. Courts must be cautious lest we inhibit vigorous public debate about such public issues. If we err, it should be on the side of allowing free-flowing discussion of current events. We must allow plenty of "breathing space" for such commentary. (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. 323, 342 [41 L.Ed.2d 789, 806-807]; *Harte-Hanks Communications* v. *Connaughton* (1989) 491 U.S. 657, 685-686 [105 L.Ed.2d 562, 587-588, 109 S.Ct. 2678]; *Milkovich* v. *Lorain Journal Co., supra,* 497 U.S. 1, 19 [111 L.Ed.2d 1, 18].) We conclude, under the totality of the circumstances, that McMillan's letter to the editor is not defamatory and therefore not subject to an action for libel.

The judgment is reversed. Costs to McMillan.

Stone (S. J.), P. J., and Yegan, J., concurred.

A petition for a rehearing was denied July 8, 1994, and respondent's petition for review by the Supreme Court was denied September 26, 1994. Baxter, J., was of the opinion that the petition should be granted.