132 F.Supp.2d 1261 (2001)
GLOBAL TELEMEDIA INTERNATIONAL, INC.; Jonathon Bentley-Stevens; Regina S. Peralta, Plaintiffs,
v.
DOE 1 aka Bustedagain40; Doe 2 aka Electrick_Man; Doe 3 aka Bdaman609; and Does 4 through 35, inclusive, Defendants.
No. SACV00-1155DOCEEX.
United States District Court, C.D. California.
February 23, 2001.
*1262 *1263 Curtis C Chen, Kevin J Hizon, Curtis C Chen & Associates, Huntington Beach, CA, for Global Telemedia International Inc., Jonathon Bentley-Stevens, Regina S Peralta, plaintiffs.
Megan E Gray, Brian A Ross, Baker & Hostetler, Los Angeles, CA, B. Kent Warner, David C Olson, Cassidy Warner Lane & Winstead, Santa Ana, CA, for Doe 1 aka Bustedagain40, Doe 2 aka Electrick_Man aka Ronald Reader, Doe 3 aka Bdaman609 esa Barry King, Does, 4 through 35 inclusive, defendants.

ORDER GRANTING DEFENDANTS' SPECIAL MOTION TO STRIKE
CARTER, District Judge.
Before the Court are Special Motions to Strike brought by Defendant Barry King aka BDAMAN609 ("King") and Defendant Reader aka ELECTRICK_MAN's ("Reader"). King and Reader filed two separate motions; because they raise the identical legal arguments based on similar facts, the motions will be considered together. The Court deems this matter appropriate for decision without oral argument. See Fed. R.Civ.P. 78; Local Rule 7.11. Accordingly, the hearing scheduled for February 26, 2001 at 8:30 a.m. is removed from the Court's calendar. After consideration of all papers submitted by both Defendants and Plaintiffs, the Court GRANTS Defendant Reader's Motion and GRANTS Defendant King's Motion.

I. Background
Plaintiff Global Telemedia International, Inc. ("GTMI") is a publicly traded telecommunications company trading on the National Association Securities Dealers OTC Bulletin Board ("OTCBB") or the Electronic Bulletin Board. The OTCBB is a regulated quotation service that displays real-time quotes, last-sale prices, and volume information in over-the-counter equity securities. An OTC company typically is not listed or traded on NASDAQ or a national securities exchange.
While GTMI had been incorporated and operated under various management teams, Plaintiff Jonathon Bentley-Stevens ("Stevens") took over the company in June 1999. The company began trading publicly as GTMI in that month.[1] Its press releases describe it as "a leader in Voice over IP, LAN VPN (Virtual Private Network), ISP, Virtual ISP, and PC-PC, PC-Phone, data and voice, Smart e-Card solutions, (www.smart-e-card.net). It also owns manufacturing, telecom, ISP, and software development facilities in Australia, Malaysia and the Philippines." Gray Decl., Ex. T. It has traded from around $0.80 a share in June of 1999 to a high of *1264 around $4.70 a share in March of 2000 to a low of $0.25 share in October 2000. Opp'n to King Mot. at 9. It spiked up to the $2.75 range and back down below $1.00 between approximately March and April of 2000. It has closed at below $1.00 a share since April of 2000. Stevens Decl. in Opp'n to King Mot., Ex. B-1.
Between March 2000 and the filing of the instant complaint, Defendant Reader and Defendant King posted numerous messages on the Raging Bull Message Boards, an Internet bulletin board.[2] Raging Bull is a financial website that organizes individual bulletin boards or "chat-rooms," each one dedicated to a single publicly traded company. The chat-rooms are open and free to anyone who wants to read the messages; membership is also free and entitles the member to post messages. While the majority of posters appear to be investors in the company or prospective investors, stock ownership is not required to post. Posters typically are not identified by their real names, but by names created by each individual. For example, as noted above, Reader posted under the name of "electrick_man" and King posted under the name "BDA-MAN609." Other handles include "fools-fool9," "raginghuff," "nvshawty," "akitaman," and "joemeat." Gray Decl., Ex. G.
Unlike many traditional media, there are no controls on the postings. Literally anyone who has access to the Internet has access to the chat-rooms. The chat-rooms devoted to a particular company are not sponsored by that company, or by any other company. No special expertise, knowledge or status is required to post a message, or to respond. The postings are not arranged by topic or by poster. The vast majority of the users are, because of the "handles," effectively anonymous. The messages range from relatively straightforward commentary to personal invective directed at other posters and at the subject company to the simply bizarre. For example, one exchange includes "joemeat, you are one of the stupidest suckers that ever posted here" to which "joemeat" responded "akita: that means so much coming from a degenerate who speaks regularly from his lower orifice." Gray Decl., Ex. G.
It is in this milieu that Reader and King posted messages in the GTMI chat-room. Reader began posting in March 2000 and apparently has continued at least through October 2000. King began posting in March 2000 as well. The postings are the subject of the instant complaint. Both Reader and King posted negative and allegedly libelous comments about GTMI and Stevens. Plaintiffs filed a complaint in state court for trade libel, libel per se, interference with contractual relations and prospective economic advantage against several posters, including Reader and King; Defendants removed the matter to this Court on November 22, 2000. Reader and King filed separate motions to strike pursuant to California Civil Procedure § 425.16.

II. Discussion
Reader and King are being sued as a result of less-than-flattering postings about GTMI on the Internet. In bringing their motions to strike under § 425.16, King and Reader argue that this suit is brought against them as a "transparent effort to intimidate and silence individuals who are critical of Plaintiffs' corporate performance." Reader Mot. at 1.
Section 425.16 was passed in 1992. The California State Legislature found that
[T]here has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. *1265 To this end, this section shall be construed broadly.
§ 425.16(a).
These disfavored lawsuits are commonly referred to as Strategic Litigation Against Public Participation, or SLAPP, lawsuits. Section 425.16 permits a defendant to dismiss a lawsuit if the alleged bad acts arose from his or her exercise of free speech "in connection with a public issue" and if the plaintiff cannot show a probability of success on the claims. § 425.16(b)(1). Thus, the questions before the Court are (1) whether the postings were an exercise of Defendants' right to free speech "in connection with a public issue," and (2) whether Plaintiffs have a probability of success on their claims.

A. "In Connection with a Public Issue"
Section 425.16(e) provides that an "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with public issue includes: ... (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." Plaintiffs do not argue that Reader and King were not exercising their right to free speech or that their speech did not take place in a public forum. Rather, Plaintiffs argue that King and Reader were engaging in commercial speech, specifically defamatory commercial speech, about a company which is not of public interest but simply has been exposed to media coverage. Plaintiffs argue that to extend the SLAPP provisions to commercial contexts or to commercial speech would eliminate the tort of business defamation. Plaintiffs' arguments are not supported by law or the facts of this case.
GTMI is a publicly traded company with as many as 18,000 investors between March 2000 and October 2000. Stevens Decl. in Opp'n to King Mot. ¶ 12. GTMI itself has inserted itself into the public arena and made itself a matter of public interest by means of numerous press releases issued since 1999. Gray Decl., Ex. P at 97; Ex. Q at 112; Ex. R. at 122; Ex. T at 127-49; Ex. U at 150-53; Stevens Decl. in Opp'n to Reader Mot., Ex. D at 5. Further, a publicly traded company with many thousands of investors is of public interest because its successes or failures will affect not only individual investors, but in the case of large companies, potentially market sectors or the markets as a whole. This is particularly so when the company voluntarily trumpets its good news through the media in order to gain the attention of current and prospective investors. The fact that a chat-room dedicated to GTMI has generated over 30,000 postings further indicates that the company is of public interest.
Its status as a commercial enterprise does not, as GTMI would have it, insulate it from a SLAPP motion. See Church of Scientology of Cal. v. Wollersheim, 42 Cal. App.4th 628, 651, 49 Cal.Rptr.2d 620, 633 (1996) (holding that matters of public interest "include product liability suits, real estate or investment scams, etc."). While of course the Court is not implying that GTMI is connected to a scam, the point is that GTMI is not a matter of public interest merely because of "media attention" or "sensation" but rather because it has had over 18,000 public investors and is the topic of literally tens of thousands of Internet postings.[3]
The cases cited by Plaintiffs do not suggest otherwise. In Globetrotter Software, *1266 Inc. v. Elan Computer Group, 63 F.Supp.2d 1127, 1130 (N.D.Cal.1999), the court found that the "`issue of public interest' test is not met by `statements of one company regarding the conduct of a competitor company.'" The court explicitly rejected applying the anti-SLAPP provisions to cases involving business competitors, but equally clearly did not reject the use of the provisions to all commercial cases or to all cases involving trade libel. Adopting the court's reasoning here, Reader and King are small individual investors who are not in the communications business, or in any business that could be said to be competing with Plaintiffs. They were speaking not as competitors, but simply as investors.
Plaintiffs' assertions to the contrary, applying the anti-SLAPP statute here will not have a chilling effect on business defamation cases in general. This holding does not foreclose defamation cases involving two competitors. Nor does it necessarily foreclose defamation cases against individuals, as not all businesses will be found to be a "public issue." Further, even where a business is found to be of public concern, where there is a probability of success, the claim may proceed.
The Court finds that the anti-SLAPP provisions are applicable in this matter and that Reader's and King's postings were an exercise of their free speech in connection with a public issue.

B. Probability of Success
Once a defendant has established a prima facie case that the basis of the claims against him arose out of acts in furtherance of his right to free speech in connection with a public issue, the burden shifts to plaintiff to demonstrate a probability of success. Globetrotter Software, 63 F.Supp.2d 1127 at 1129. Here, GTMI has alleged trade libel, libel per se (defamation) and interference with contractual relations and prospective economic advantage.

1. Trade Libel and Defamation

a. Standards

Trade libel requires that Reader and King published a false statement which induced others not to deal with Plaintiffs, knowing it was false or acting with reckless disregard of its falsity, and caused Plaintiff monetary damages. Polygram Records, Inc. v. Superior Court, 170 Cal.App.3d 543, 548-9 216 Cal.Rptr. 252, 254-55 (1985). Defamation requires a false statement of fact made with malice that caused damage. Ringler Assoc. Inc. v. Maryland Cas. Co., 80 Cal.App.4th 1165, 1179, 96 Cal.Rptr.2d 136, 148 (2000).
Both Reader and King argue that their statements were opinion and that opinions are not actionable under either trade libel or libel per se; GTMI responds that statements in a business context which imply dishonesty or incompetence are actionable, and that the opinion/fact distinction as set forth in the media cases cited by Reader and King is irrelevant because it applies only to the media. As to Plaintiffs' first argument, Defendants and Plaintiffs are not competitors and the chat-rooms do not constitute a business context. Rosenberg v. J.C. Penney Co., 30 Cal. App.2d 609, 86 P.2d 696 (1939) is inapposite here, as it involved two business competitors, with one using artful advertising to convey libelous sentiments about its rival.
As to Plaintiffs' second argument, as Reader and King correctly argue, the fact/opinion distinction does not apply just to media defendants. See Nicosia v. De Rooy, 72 F.Supp.2d 1093, 1101 (N.D.Cal. 1999) (applying fact/opinion distinction in case alleging that defendant's website postings were libelous); Rudnick v. McMillan, 25 Cal.App.4th 1183, 1191, 31 Cal.Rptr.2d 193, 197 (1994) (applying fact/opinion standard in case where defendant wrote an allegedly defamatory letter to the editor of a local newspaper). If the *1267 statements are opinion rather than fact, then they are not actionable.
To determine whether a statement is an opinion or fact, the Court must look at the totality of the circumstances. This entails examining the statement in its "broad context, which includes the general tenor of the entire work, the subject of the statement, the setting, and the format of the work." Nicosia, 72 F.Supp.2d at 1101 (citing Underwager v. Channel 9 Australia, 69 F.3d 361, 366 (9th Cir.1995)). Then, the specific context and content of the statement is examined, "analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation." Finally, the Court must determine whether the statement is "sufficiently factual to be susceptible of being proved true or false." Id.

b. Application

Here, the general tenor, the setting and the format of both Reader's and King's statements strongly suggest that the postings are opinion. The statements were posted anonymously in the general cacophony of an Internet chat-room in which about 1,000 messages a week are posted about GTMI. The postings at issue were anonymous as are all the other postings in the chat-room. They were part of an on-going, free-wheeling and highly animated exchange about GTMI and its turbulent history. At least several participants in addition to Defendants were repeat posters, indicating that the posters were just random individual investors interested in exchanging their views with other investors.
Importantly, the postings are full of hyperbole, invective, short-hand phrases and language not generally found in fact-based documents, such as corporate press releases or SEC filings. For example, in June, King posted the following:
get off my back cowboy I am ready to send that message to the powers that be since you just accused me of being a druGgie, libel slanderous cheap attack. This company has put it up your arse again this week no filing no nothin no chance to buy it OFF SHORE ON INTERNATIONAL EXCHANGES, dill weed I bet you get your frustrations worked out at he YMCA stupid flippin puss I got info comin at you that will make you puke about this stock and then you can thank me.
Stevens Decl. in Opp'n to King Mot., Ex. A at 53.
Or,
nschefet or whatever hey I hold several thousand shares mysefl and I am still in the green but God what a way to make your day go by and watch the soap opera and everyhting is within the electronic world guidelines grow up kids before you fall off your perch Go GTMI ....roflmao again oh too much fun goodbye kids and thanks for the death threat the webmaster will love it:).
Id., Ex. A at 46.
To put it mildly, these postings, as well as the others presented to the Court, lack the formality and polish typically found in documents in which a reader would expect to find facts. It is unlikely, for example, that a corporation would express the view that investors should "up the volume for some of that 2 dollar love" or "gotta love this companies potential." Id., Ex. A at 57. Nor would the SEC ever state that GTMI is "steering the sinking ship but don't worry they are headed for the calmer waters of the carribean where your money will be safe from federal authorities." Id., Ex. A at 39.
In short, the general tone and context of these messages strongly suggest that they are the opinions of the posters. In addition, the content and style of the individual postings support a finding that they are the opinions of the posters.

i. Reader

Reader posted two messages stating that the company's plans were slow, practically *1268 non-existent or just plans on a drawing board. Stevens Decl. in Opp'n to Reader Mot., Ex. 1 at 37, 43. In the first, Reader states, "The thing that concerns me is their PR statements give them the appearance of being so high tech, so cutting edge but their real life product is so slow or non-existant." Id. at 37. A day later, on March 26, 2000, he posted a second message in reply to "joemeat" which appears to be a clarification of his first posting: "Restatement[.] The companies statements are so forward looking that: `Their real life product roll-out is so slow and several of their products are just plans on the drawing board (do not exist).' Thanks for pointing out my error." Id. at 43.
In both messages, Reader uses exaggeration, figurative speech and broad generalities. Nothing in these statements suggests that he is speaking knowledgeably about the company. He does not specify the products or the PR statements. Nor does he say that GTMI says anything contrary to his statement about the products. Rather, Reader appears to be making a broad statement that he does not agree with GTMI's PR statements. The reasonable reader, looking at the hundreds and thousands of postings about the company from a wide variety of posters, would not expect that Electrik_Man was airing anything other than his personal views of the company and its prospects. See Biospherics v. Forbes, 151 F.3d 180, 184 (4th Cir. 1998) (holding that a column's observation that a company's stock price was based on "hype and hope" was opinion).
In another posting on March 25, Reader posted the following: "SEC link[.] To view Jonathon Bentley Stevens violations: http://www.sec.gov/enforce/litigrel/lr15774.txt[.] He was busted for misrepresentation and overstatement of the facts: Let the truth be told...." Here, his statement about Stevens is clearly based on a public document which he provides for the readers. Thus, any reader may look at the same document and determine what they think of the information. By supplying the underlying document which supports his views, Reader has set forth an opinion, not fact. Nicosia, 72 F.Supp.2d at 1102.
In addition, despite Plaintiffs' argument to the contrary, "busted" in this context does not mean "arrested." While the average investor may interpret "busted" as "caught" or "found out," that reader is highly unlikely to believe that the SEC has arrested anyone for "misrepresentation" or "overstatement." Reader is simply stating his opinion that the SEC is investigating Bentley-Stevens, which in point of fact it is. Gray Decl., Exs. A, B, C.

ii. King

King posted at least 57 messages between March and October 2000. Stevens Decl. in Opp'n to King Mot., Ex. A at 2-58. Plaintiffs place several at issue in their oppositions.

1) "Sinking Ship"
On June 12, 2000, at approximately 4:37 p.m., King posted the following:
akitaman we did get news today! another board poster says the PR will come out tomorrow....rolfmao that was funnier than some of my jokes today.... another day with GTMI steering the sinking ship, but don't worry they are headed for the calmer waters of the carribean where your money will be safe from federal authorities,,now thats newz, speling was for hyplori:)"
Stevens Decl. in Opp'n to King Mot., Ex. A at 39.
Here, in the context of the full message, King's comments are hyperbolic and figurative. The posting is also in response to another posting, making it less likely to be a statement of fact. Given the tone and context of the message, a reasonable reader would not take this to be anything more than a disappointed investor who is making sarcastic cracks about the company. At this point, the company was trading as *1269 low as $0.43 a share and closed at $0.75, so it would not be unreasonable for an investor to be sarcastic about a company he bought at $2.00. Nor are these statements susceptible to proof, as would be a statement of fact.

2) "Fly the Coop"
Plaintiffs identify another message dated June 12, 2000, at 4:48 p.m. which reads in full:
uncle ernie trust your stomach, that feeling that says we are beeing manipulated by the company so that they can fly the coop again, who oh why must we keep saying I hear they are, they said they were, WERE IS THE PR TO THE LONGS SAYING SORRY FOOLS WE WENT BELLY UP SORRY FOR SPOING YOUR WEEKEND, SORRY FOR NOT MEETING OUR TARGET DATES AND OH YEA SORRY WE MISSED THE BOAT IN GETTING OUR PRODUCT OUT. And as for MYIQ, get real that is a shell company and the history is sour, no one is ready for Internet education well maybe hyplori since he/she is the spelling critic."
Stevens Decl. in Opp'n to King Mot., Ex. A at 37.
Plaintiffs argue that "fly the coop again" is stating a fact that "GTMI not only intends to steal investor money, but that such theft is or will be merely a repeat of a previous GTMI theft. This is not opinion, but an outright accusation of criminal intention coupled with proof based on alleged albeit unstated prior criminality." Opp'n to King Mot. at 8. First, the Court notes that "fly the coop" is a colloquial expression meaning "to depart suddenly or surreptitiously, escape, flee." Webster's Third New Int'l Dictionary 879 (1986). There is no implication of theft or criminality. Second, "fly the coop" is part of a rambling sentence full of figurative and expressive language ("trust your stomach," "why oh why") and sarcasm. Given the context and the content, no reasonable reader would believe that King was stating a fact that the company was going to flee or escape. Again, the statement is simply part of a negative rant against a company that on that date closed at $0.75 a share. The posting is written with a great deal of linguistic informality, thus alerting a reasonable reader to the fact that these observations are probably not written by someone with authority or firm factual foundations for his beliefs.

3) "Screwed out of your money"
On October 2, King posted: "Dick T is a done deal you and I don't count, sell tomorrow take your dollars, write off the loss, buy some Krispy Kreme they will do well in the 4th Q as the holidays are a comin.....and by the way if you go to the SHM make sure you take a piece of the furniture its the only gift you will receive from these jokers.....you have been screwed out of your hard earned money here its time to talk about a lawsuit." Stevens Decl in Opp'n to King Mot., Ex. A at 12.
Plaintiffs argue that "Mr. King appears to be soliciting a shareholder lawsuit against GTMI." Opp'n to King Mot. at 8. While the Court disagrees with this interpretation, even if that is the import of the message, then it is simply the opinion of a shareholder who believes a lawsuit may be his only recourse against a company whose stock was then trading at around $0.45 a share. Even if it were a fact that King were actually soliciting a lawsuit, stating that intent is not actionable libel.

4) "Lie"
On October 7, 2000, King posted, "I have never witnessed such blatant mis-management, these people hold our money and they dictate after they lie how it will be used.......greatest joke on the boards." Stevens Decl. in Opp'n to King Mot., Ex. A at 4. This Plaintiffs interpret as King saying, "in essence, that GTMI misrepresents its business intentions, apparently as part of its standard practice to say anything to *1270 raise investor funds." Opp'n to King Mot. at 8. Again, while King's sentiments are not positive, the statement contains exaggerated speech and broad generalities, all indicia of opinion. Given the tone, a reasonable reader would not think the poster was stating facts about the company, but rather expressing displeasure with the way the company is run. This is especially the case given that the closing price per share in early October was about $0.45.
In sum, neither Reader's nor King's postings are statements of fact. Given the general context of the postings, the colorful and figurative language of the individual postings, the inability to prove the statements true or false, and in one case, the posting of documents to support the poster's statements, the postings are opinions.

iii. Damages
Even if the statements were actionable statements of fact, and not opinion, Plaintiffs must show damages as a result of the postings. Plaintiffs contend that they were damaged by both Defendants' postings because the postings caused the stock to lose value, and Plaintiffs further contend that Defendants posted their messages with that intent. Opp'n to King Mot. at 1, 9 and 17; Opp'n to Reader Mot. at 13-14. The facts do not support Plaintiffs' contention.
With respect to King, there is no correlation between his postings and the drop in stock prices. King's first posting on March 17, 2000 was a glowing recommendation: "wayitgoes, I am loading up, Schwab won't take my nibbling had to up the volume for some of that 2 dollar love. This and my EDIG will take me to the next level. Gotta love this companies potential. Bdaman with GTMI in his hand!!!." Stevens Decl. in Opp'n to King Mot., Ex. A at 58. GTMI closed on March 13, 2000 at $2.03 after trading as high as $4.76. King's next two postings, dated March 29 and April 4, were also positive. During this time, the stock dropped in value, losing about one third of its value. The stock closed on March 27 at $1.67, and on April 3 at $1.31. Thus, during the time King posted positive comments, the stock had already fallen from a closing high of $2.03 to a close of $1.31. See generally id., Ex. B at 3-4 for share prices.
King posted his first negative comments on May 31. By that time, the stock had slipped even further to $0.68. Thus, prior to King's first negative posting, GTMI's stock had already dropped from a high of $2.03 to a low of $0.68  with no assistance from King. The stock then traded between $0.62 and $0.87 for the period May 31 through August 14. During the time, as the stock moved up and then down, King posted 23 messages, all negative and allegedly libelous. Even if his postings caused downward movements, which given the thousands of postings every day is unlikely, the stock altogether lost four cents (the difference between $0.68 and $0.64)  an insignificant drop compared to the loss in value represented by a drop between $2.00 and $0.68.
Looking more closely at that period of time, causation becomes even more problematic. For example, the stock moved from $0.78 to $0.62 between July 24 and August 14, 2000. During that same period, King posted once. Plaintiffs have not shown any correlation between King's posting and any loss in value, and the opposite conclusion is borne out: GTMI's stock lost significant value entirely unaided by King.
Similarly, damages cannot be shown with respect to Reader's statements. For example, his first negative posting is dated March 25, 2000. By that time, the stock had already dropped from a closing high of $2.67 on March 6 to closing of $1.62 on March 20. A week after his negative posting, the stock closed at $1.68, up six cents.
In sum, the Court finds that Plaintiffs have not satisfied their burden to show a probability of success on their claims for *1271 trade libel and defamation.[4]

2. Further Discovery
Plaintiffs argue that if the Court is inclined to grant Defendants' motions, it should stay the decision to allow Plaintiffs limited discovery regarding King's general experience in trading stocks, his over-all knowledge and sophistication regarding valuation of lower-dollar stocks such as GTMI, including the effect of "consumer" comments. Opp'n to King Mot. at, n2. In Rogers v. Home Shopping Network, Inc., 57 F.Supp.2d 973, 985 (C.D.Cal.1999), the court held that if a plaintiff requires discovery to oppose a motion brought under § 425.16, the hearing on the motion should be stayed until discovery is completed.
Here, Plaintiffs' request for discovery does not fall within the scope of Rogers. King's experience in trading is irrelevant to the questions raised in this motion, including issues of damage and whether the postings were fact or opinion. Having made the legal determination that the statements must be factual to be actionable, and having further found that the postings are opinions rather than actionable facts, the Court does not require further evidence to evaluate Plaintiffs' claims. Nor do Plaintiffs suggest that further facts are necessary to evaluate whether the postings are indeed fact or opinion. Similarly, Plaintiffs do not suggest any facts which may be relevant to determining the damage caused by the postings. Since both issues are dispositive of Plaintiffs' claims, no further discovery is necessary.
Plaintiffs' request for discovery is DENIED.

III. Disposition
The Court GRANTS Defendant King and Defendant Reader's Motions to Dismiss. The Court DENIES Plaintiffs' request for discovery.
IT IS SO ORDERED.
NOTES
[1] As of September 2000, GTMI began trading as GLTI. All parties continue to refer to the company as GTMI. To avoid confusion, the Court will follow suit.
[2] Raging Bull is not a party to this action.
[3] The Court notes that Plaintiffs cite Zhao v. Wong, 48 Cal.App.4th 1114, 55 Cal.Rptr.2d 909 (1996) for the proposition that "sensation" or media attention does not create an issue of public interest. Zhao, however, has been specifically disapproved by the California Supreme Court on exactly this point. Briggs v. Eden Council for Hope & Opportunity, 19 Cal.4th 1106, 81 Cal.Rptr.2d 471, 969 P.2d 564 (1999) (disapproving of Zhao's reading of "public interest" as too narrow). The legislature amended § 425.16 in 1997 to specifically provide that the section "shall be construed broadly."
[4] Claims for interference with contractual relations and interference with prospective economic advantage also have a damage component. For the reasons noted here, Plaintiffs cannot show damages as a result of Defendants' postings, and therefore they cannot succeed on these causes of action.