[No. A129800. First Dist., Div. Four. May 29, 2012.]

SUMMIT BANK, Plaintiff and Respondent, v.
ROBERT ROGERS, Defendant and Appellant.

676

Counsel

Sweeney, Mason, Wilson & Bosomworth, Kurt E. Wilson and Scott A. Mangum for Defendant and Appellant.

Law Offices of Steven B. Piser, Steven B. Piser, J. Scott Isherwood; Esner, Chang & Boyer and Andrew N. Chang for Plaintiff and Respondent.

Leland Chan for California Bankers Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Opinion

RUVOLO, P. J.—

## I.

## INTRODUCTION

Summit Bank (the Bank) sued its former employee Robert Rogers (Rogers) for posting allegedly defamatory messages on a section of the Craigslist.org Internet Web site (Craigslist) entitled "Rants and Raves." The Bank alleged that Rogers, "under the guise of anonymity, made false and libelous statements about [the Bank's] operations, the integrity of its chief executive officer and founder, the safety of depositors' funds and made false statements about audits and regulatory actions." Rogers moved to strike the Bank's

complaint pursuant to Code of Civil Procedure section 425.16,[1] California's "anti-SLAPP" statute, on the ground that the suit was brought for the illegitimate purpose of chilling Rogers's right to speak freely about the Bank.[2] Rogers's appeal is from the trial court's order denying his motion to strike after finding (1) the statements made were not protected speech within the meaning of the anti-SLAPP law (§ 425.16, subd. (b)(1)) and (2) the Bank had shown a probability of success on the merits of its defamation claim.

We conclude that the trial court erred in both findings. In so holding, we reject the Bank's threshold argument that Rogers was precluded from using the anti-SLAPP law to strike the Bank's action because Rogers's "underlying conduct was illegal as a matter of law" and thus "falls outside protected speech and petition rights." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 320, 324 [46 Cal.Rptr.3d 606, 139 P.3d 2] (*Flatley*).) Specifically, the Bank claims Rogers's posts on Craigslist were illegal under Financial Code section 1327, which imposes criminal liability when an untrue "statement or rumor" is made that is "directly or by inference derogatory" to a bank's financial condition. We find that, even if Rogers's speech violated the statute, it cannot be deemed "illegal as a matter of law" because Financial Code section 1327 is an impermissible content-based restriction on speech protected by federal and state constitutional free speech guarantees. (*Flatley, supra,* 39 Cal.4th at p. 320; U.S. Const., 1st Amend.; Cal. Const., art. I, § 2.) Therefore, the anti-SLAPP statute applies to the Bank's defamation action against Rogers.

We further find that Rogers met his burden of showing that the Bank's defamation action arose from an act in furtherance of his constitutional right of free speech in connection with "an issue of public interest" (§ 425.16, subd. (e)(3)). Because the Bank failed to satisfy its burden of showing a probability of success on the merits, Rogers's anti-SLAPP motion should have been granted. Consequently, we reverse and remand for further proceedings.

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[2] "SLAPP is an acronym for strategic lawsuit against public participation. [Citation.]" (*Balzaga v. Fox News Network, LLC* (2009) 173 Cal.App.4th 1325, 1329, fn. 3 [93 Cal.Rptr.3d 782] (*Balzaga*).) To ensure that "participation [in matters of public significance] not be chilled through abuse of the judicial process" (§ 425.16, subd. (a)), the Legislature established a presumption against the maintenance of litigation arising from any act "in furtherance of the [defendant]'s right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue" (§ 425.16, subd. (b)(1)). Once a court determines that such an issue is involved, the cause of action "shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (*Ibid.*)

## II.

## FACTS AND PROCEDURAL HISTORY

The Bank, which describes itself as a "community bank headquartered in Oakland, California," commenced this action on August 17, 2009, by filing a complaint against unknown Doe defendants.[3] Among other things, the complaint alleged a cause of action for defamation, contending that "[b]eginning in about May 2009, and continuing at various times thereafter" Doe defendants published false statements about the Bank with the intent to defame the Bank's "good name and reputation." The Bank eventually learned Rogers's identity as the person who published the alleged defamatory statements after the court granted the Bank's request to serve a subpoena on Craigslist. Rogers was formerly employed by the Bank as its vice-president and chief credit administrator from September 2007 until September 2008, when he resigned.

The operative complaint for our purposes is the Bank's second amended complaint (SAC) filed against Rogers on October 8, 2010. The SAC alleges a single cause of action for defamation based on Internet posts in the "Rants and Raves" section of Craigslist starting in or about May 2009 and ending about July 2009. Each post was retained for public view for seven days, after which the posts were automatically deleted by Craigslist. While it is claimed Rogers posted 21 derogatory comments in a two-month period, the Bank contended "[a]t least five of Rogers's posts included defamatory statements . . . ." (Fn. omitted.) The alleged defamatory posts read as follows:

The June 7, 2009 post: "Being a stockholder of this screwed up Bank, this year there was no dividend paid. The bitch CEO that runs this Bank thinks that the Bank is her personel [*sic*] Bank to do with it as she pleases. Time to replace her and her worthless son."

The June 21, 2009 post: "Whats [*sic*] up at this problem Bank. The CEO provides a [*sic*] executive position to her worthless, lazy fat ass son Steve Nelson. [¶] This should not be allowed. Move your account now."

The July 14, 2009 post: "The FDIC and the California Department of Financial Institutions are looking at Summit Bank. This is the third time in less than one year. This is not a good thing, move your accounts ASAP."

---

[3] As explained by our Supreme Court, California "law permits what is commonly referred to as 'Doe' pleading. [Citations.] Under this procedure, a plaintiff 'ignorant of the name of a defendant . . . must state that fact in the complaint,['] and may designate 'such defendant . . . in any pleading or proceeding by any name,' and, 'when [the defendant's] true name is discovered, the pleading or proceeding must be amended accordingly.' (§ 474.)" (*Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 941–942 [30 Cal.Rptr.2d 440, 873 P.2d 613].)

The July 25, 2009 post: "I had banked at Summit Banks [*sic*] Hayward Office. Service was poor and Summit Bank closed this office. Whats [*sic*] up with that. [¶] All the customer [*sic*] were left high and dry. This is a piss poor Bank. I would suggest that anyone that banks at Summit Bank leave before they close."

The second July 25, 2009 post: "Move your accounts now before its [*sic*] too late."

Although the posted messages were anonymous, with the poster being identified by a pseudonym, Rogers admitted that he posted each of these messages. However, it was Rogers's position that he "had the right under the First Amendment to express these opinions, especially in the context in which he expressed them, where it was clear that these were/are his opinions and not facts."

On July 6, 2010, Rogers filed an anti-SLAPP motion under section 425.16 to strike the Bank's complaint. Rogers asserted that the Bank's complaint fell within the ambit of the anti-SLAPP statute because the messages he posted on Craigslist were acts in furtherance of his constitutionally protected right to free speech "in connection with a public issue" or "an issue of public interest" (§ 425.16, subd. (e)(4)). He additionally claimed that the Bank could not establish a probability of prevailing on its defamation action because the bulk of the posts constituted Rogers's opinions, and the facts that were set forth in the posts were true.

In its opposition, the Bank argued that the posted statements constituted unprotected speech because "making false claims against a bank is criminal." In making this argument, the Bank invoked Financial Code former section 756, reenacted verbatim and renumbered as Financial Code section 1327,[4] which imposes criminal liability when an untrue statement or rumor is made which is directly or by inference derogatory to a bank's financial condition. Additionally, the Bank claimed that Rogers's Craigslist posts did not concern an issue of public interest. The Bank also asserted that it would prevail on its claim for defamation.

On September 10, 2010, after hearing argument, the trial court denied Rogers's motion to strike the Bank's complaint. In its written order, the trial court determined (1) Rogers "has not sustained his burden to show that the conduct falls within the provisions of . . . section 425.16[, subdivision] (b)(1)

---

[4] On September 6, 2011, the Governor signed Senate Bill No. 664 (2011–2012 Reg. Sess.) into law, which repealed Financial Code section 756, but reenacted it verbatim within the same code as section 1327. (Added by Stats. 2011, ch. 243, § 3.) Because Financial Code section 1327 took effect on January 1, 2012, we refer to the statute's current renumbered version.

because the conduct did not arise from an act in furtherance of any protected constitutional activity" and (2) the Bank has "demonstrated that it has established a probability that it will prevail on the claim." This appeal followed.[5]

## III.

## DISCUSSION

### A. *Standard of Review*

(1) A two-step process is followed in determining the outcome of a special motion to strike pursuant to section 425.16. " 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. (§ 425.16, subd. (b)(1).) "A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e)" [citation]. If the court finds that such a showing has been made, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim. (§ 425.16, subd. (b)(1) . . . .)' [Citations.] 'Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.' [Citation.]" (*Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 645 [24 Cal.Rptr.3d 619].)

■ Where a defendant brings a special motion to strike based on a claim that the plaintiff's action arises from activity in furtherance of the defendant's exercise of protected speech or petition rights, but the supposedly protected speech or petition activity was illegal as a matter of law, the defendant is precluded from using the anti-SLAPP statute to strike the plaintiff's action. (*Flatley, supra,* 39 Cal.4th at p. 320.) If a factual dispute exists about the lawfulness of the defendant's conduct, it cannot be resolved within the first prong, but must be raised by the plaintiff in connection with the plaintiff's burden to show a probability of prevailing on the merits (the second prong). (*Ibid.*)

Appellate review of a trial court's ruling on an anti-SLAPP motion is de novo. (*United States Fire Ins. Co. v. Sheppard, Mullin, Richter & Hampton LLP* (2009) 171 Cal.App.4th 1617, 1625 [90 Cal.Rptr.3d 669].) " 'Thus, [appellate] review is conducted in the same manner as the trial court in

---

[5] The instant order, denying a special motion to strike made pursuant to section 425.16, is appealable. (§ 425.16, subd. (i).)

considering an anti-SLAPP motion.' " (*Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1016 [85 Cal.Rptr.3d 838].)

B. *The Bank Has Failed to Establish That Rogers's Speech Was Illegal as a Matter of Law*

The Bank has vigorously and consistently claimed throughout this litigation that Rogers cannot invoke anti-SLAPP protection because his posts on Craigslist fall within an exception to the anti-SLAPP statute for speech that is *illegal* as a matter of law. (See *Flatley, supra,* 39 Cal.4th at p. 320.) Specifically, the Bank has argued that its claim against Rogers for defamation "is based on conduct by Rogers which constitutes a violation of Financial Code section 756 [(now Fin. Code, § 1327)] and thus is outside the protective umbrella of an anti-SLAPP's special motion to strike procedure, because it is based on alleged criminal activity."

Financial Code section 1327, subdivision (a) provides: "Any person who willfully and knowingly makes, circulates, or transmits to another or others, any statement or rumor, written, printed, or by word of mouth, which is untrue in fact and is directly or by inference derogatory to the financial condition or affects the solvency or financial standing of any bank doing business in this state, or who knowingly counsels, aids, procures, or induces another to start, transmit, or circulate any such statement or rumor, is guilty of a misdemeanor punishable by a fine of not more than one thousand dollars ($1,000), or by imprisonment for not more than one year, or both."

Although the general language used in Financial Code section 1327 has been the law in California since 1917 (Stats. 1917, ch. 79, § 1, p. 92), there are no reported cases interpreting this provision. The Bank has provided us with historical information indicating that the genesis of section 1327 was a model statute drafted by the American Bankers Association (the Association) in 1907 to " 'punish persons who maliciously make or circulate derogatory statements or stories affecting the standing and credit of banking institutions—a kind of evil to which banks are peculiarly subject, and which often causes great injury not only to the bank or banks affected but to the general public.'. . ." Apparently, over a century ago, the Association lobbied Congress and state legislatures to make the dissemination of untrue statements and rumors about the financial condition of commercial banks a criminal offense after several bank runs were ignited or exacerbated by published statements that occurred during the bank panic of 1907–1908. (See Mathewson, *From Confidential Supervision to Market Discipline: The Role of Disclosure in the Regulation of*

*Commercial Banks* (1986) 11 J. Corp. L. 139, 147 (Mathewson).) Consequently, a bill was introduced into the first session of the 60th Congress, which read in pertinent part as follows: "That any person who shall make, circulate, or transmit to another or others any statement, untrue in fact, derogatory to the financial condition or affecting the solvency or financial standing of any national bank in the United States, or who shall counsel, aid, procure or induce another to start, transmit, or circulate any such statement or rumor shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine . . . ." (H.R. No. 6091, 60th Cong., 1st Sess. (1907).) While the Association's lobbying efforts proved to be unsuccessful at the federal level, numerous state legislatures, including California's, adopted the proposed law, either in its recommended form or with modifications. (Mathewson, *supra*, at p. 147.)

██ The statute adopted by California is substantially analogous to the legislation proposed, but not adopted, by Congress in 1907. It prohibits not only untrue statements, but also untrue "rumor[s]" that are "directly or by inference derogatory to the financial condition or affect[] the solvency or financial standing of any bank." (Fin. Code, § 1327, subd. (a).) It also punishes anyone who "knowingly counsels, aids, procures, or induces another" to circulate such statements or rumors. (*Ibid.*) While the Bank seizes on this language to claim that Rogers's posts on Craigslist were illegal as a matter of law, this allegation alone is not enough to preclude Rogers from using the anti-SLAPP statute to strike the Bank's action. ██ As this court has recently observed, " ' "[c]onduct that would otherwise come within the scope of the anti-SLAPP statute does not lose its coverage . . . simply because it is alleged to have been unlawful or unethical." [Citations.] An exception to the use of section 425.16 applies only if a "defendant concedes, or the evidence conclusively establishes, that the assertedly protected speech or petition activity was illegal as a matter of law." [Citation.]' " (*Cabral v. Martins* (2009) 177 Cal.App.4th 471, 482 [99 Cal.Rptr.3d 394].)

Certainly Rogers does not concede that he has committed any illegal acts. To the contrary, he has consistently maintained that the Bank's "lawsuit is meritless as a matter of law because (1) it is undisputed that the verifiable facts stated in the posts are true and (2) the other statements in the posts are as a matter of law . . . opinions as opposed to verifiable facts." Therefore, we must determine whether Rogers is "a defendant whose assertedly protected speech or petitioning activity was illegal as a matter of law, and therefore unprotected by constitutional guarantees of free speech and petition . . . ." (*Flatley, supra*, 39 Cal.4th at p. 305.) The charge of illegality necessarily implicates the subordinate issue of whether the law relied upon to assert that

the speech was "illegal as a matter of law," in this case Financial Code section 1327, could be constitutionally imposed to criminalize Rogers's speech.

Even if the Bank is correct that at least one of Rogers's posted comments violates Financial Code section 1327, we conclude that this statute cannot provide the foundation for an argument that Rogers's conduct is not protected under Code of Civil Procedure section 425.16. As we will explain, when analyzed under modern constitutional jurisprudence, the broad provisions of Financial Code section 1327, on their face, impermissibly sweep within their proscriptions speech that cannot be criminally punished. (*Flatley, supra,* 39 Cal.4th at p. 320.)

In addressing whether his conduct violated Financial Code section 1327, Rogers did not discuss any of the constitutional questions implicated by the language of the statute. Therefore, we asked for supplemental briefing on this issue. In our questions to the parties, we summarized what we believe to be some of the more problematic aspects of Financial Code section 1327, which will be discussed in detail later in this opinion.

In their supplemental briefing, the Bank and amicus curiae, the California Bankers Association, perceiving our obvious concern about the constitutionality of the statute, retreated from their previous litigation stance, urging this court to exercise "judicial self-restraint," and to resolve this appeal without addressing the constitutionality of Financial Code section 1327.[6] The Bank asks us to skip any prong-one analysis and proceed directly to prong two—an analysis of whether the Bank has demonstrated a probability of prevailing on its defamation claim. Its entreaty is supported by a citation to the Supreme Court's recent decision in *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811 [124 Cal.Rptr.3d 256, 250 P.3d 1115]. That case arose in the context of an alleged attorney conflict of interest and professional misconduct. Because the defendant's alleged misconduct related directly to matters

---

[6] This new approach was a vast departure from the stance the Bank had taken throughout this litigation. When this matter was briefed on appeal, the Bank, joined by amicus curiae California Bankers Association, left no doubt that it believed Financial Code section 1327 applied to Rogers's online criticism of the Bank and its officials, and provided the principal ground for denying his anti-SLAPP motion. Amicus curiae argued, "[M]aking untrue derogatory statements about the financial condition of a bank is not protected speech because such speech is illegal under Financial Code [former] section 756 [(now Fin. Code, § 1327)]." The Bank argued, "The Legislature has determined in enacting Financial Code [former] section 756 [(now Fin. Code, § 1327)] that Rogers'[s] statements, untrue in fact and derogatory to the financial condition or affecting the solvency or financial standing of Summit Bank, are criminal." In other words, the Bank and amicus curiae argued on appeal that Rogers's conduct was illegal as a matter of law because it fell directly within the definition of criminal libel provided in Financial Code section 1327.

involving legal ethics and the practice of law, the court chose to proceed directly to an analysis of whether the plaintiff had established a probability of prevailing on its claims, relying on its " 'inherent, primary authority over the practice of law' [citation]." (*Id.* at p. 820.) However, in so doing, our high court emphasized that generally, courts are to proceed in analyzing both prongs of anti-SLAPP motions "in order." (*Ibid.*)

Importantly here, given our conclusion that Rogers's conduct is protected activity under section 425.16, subdivision (e)(3) (see discussion in pt. III.C., *post*), and that the Bank has failed to establish a probability of success on the merits of its defamation claim (see discussion in pt. III.D., *post*), we cannot avoid deciding the enforceability of Financial Code section 1327, the only remaining contention that would defeat Rogers's anti-SLAPP motion, and allow for an affirmance of the trial court's decision to let the defamation case against Rogers proceed.

Moreover, rather than seize the opportunity to concede prong one, the Bank has steadfastly clung to its assertion that Rogers's conduct is not protected speech because it is illegal as a matter of law. Under all of these circumstances, we cannot shirk our judicial responsibility to address concerns about the statute's deterrent effect on legitimate expression, especially when the constitutional defects in Financial Code section 1327 are directly pertinent to the resolution of this appeal, facially apparent, and "the constitutional question raises important public policy issues . . . ." (*State Bd. of Education v. Honig* (1993) 13 Cal.App.4th 720, 754 [16 Cal.Rptr.2d 727] [considering constitutional question raised for the first time at oral argument].) We turn to those constitutional deficiencies now.[7]

 1. *Financial Code Section 1327 Is Facially Unconstitutional Because It Does Not Include a Malice Element*

We begin our analysis by noting that modern defamation jurisprudence, both civil and criminal, begins with two landmark opinions decided in

---

[7] While our constitutional analysis draws on both federal and state law interpreting the free speech guarantee, these constitutional provisions are not identical. California Constitution article I, section 2, subdivision (a) states: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." The United States Constitution instead couches the right to free speech as a limit on congressional power. (See U.S. Const., 1st Amend.) Accordingly, our Supreme Court has held that the state free speech clause is "more definitive and inclusive than the First Amendment . . . ." (*Wilson v. Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116]; see *Fashion Valley Mall, LLC v. National Labor Relations Bd.* (2007) 42 Cal.4th 850, 862–863 [69 Cal.Rptr.3d 288, 172 P.3d 742]; *Golden Gateway Center v. Golden Gateway Tenants Assn.* (2001) 26 Cal.4th 1013, 1019 [111 Cal.Rptr.2d 336, 29 P.3d 797].)

1964 by the United States Supreme Court, establishing stringent new constitutional standards for criminal libel statutes, such as Financial Code section 1327. First, the court held in *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710] (*New York Times*), that public officials suing for civil defamation had to prove that the alleged defamatory "statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (*Id.* at pp. 279–280.) The court reasoned that because "erroneous statement[s] [are] inevitable in free debate," the malice requirement is essential to ensure that "the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive'. . . ." (*Id.* at pp. 271–272.) Next, the court in *Garrison v. Louisiana* (1964) 379 U.S. 64 [13 L.Ed.2d 125, 85 S.Ct. 209] (*Garrison*) held that, when it came to speech about public officials, in order to establish the offense of criminal libel, the prosecution must prove that the statement in question was false and that the statement was published with actual malice. That is, the defendant published the statement "with knowledge of its falsity or in reckless disregard of whether it was false or true." (*Id.* at p. 74.)

Following our high court's pronouncements in *New York Times* and *Garrison*, one court surmised that "a strong argument may be made that there remains little constitutional vitality to criminal libel laws." (*Tollett v. U.S.* (8th Cir. 1973) 485 F.2d 1087, 1094, fn. omitted (*Tollett*).) Bearing out this observation, numerous criminal libel statutes have been held facially invalid for not incorporating truth as an absolute defense, for failing to require demonstration of actual malice, and for failing to include any "statutory language limiting the application of the present penal statute to private libel" where malice is not required. (*Id.* at p. 1097; see, e.g., *Parmelee v. O'Neel* (2008) 145 Wn.App. 223 [186 P.3d 1094, 1100–1101]; *State v. Helfrich* (1996) 277 Mont. 452 [922 P.2d 1159, 1161–1162] [collecting cases]; *Mangual v. Rotger-Sabat* (1st Cir. 2003) 317 F.3d 45, 66–67; *Tollett, supra,* 485 F.2d at pp. 1097–1098; *Commonwealth v. Armao* (1972) 446 Pa. 325 [286 A.2d 626, 632]; *Eberle v. Municipal Court* (1976) 55 Cal.App.3d 423, 432 [127 Cal.Rptr. 594]; *Ivey v. State* (Ala. 2001) 821 So.2d 937, 940–949; *Gottschalk v. State* (Alaska 1978) 575 P.2d 289, 292–296; *Fitts v. Kolb* (D.S.C. 1991) 779 F.Supp. 1502, 1515–1519; *I.M.L. v. State* (2002) 2002 UT 110 [61 P.3d 1038, 1043–1048]; see generally Annot., Validity of Criminal Defamation Statutes (1989) 68 A.L.R.4th 1014.)

█ Financial Code section 1327 is unconstitutional on its face for the same reason similar statutes have been found to be unconstitutional—it does not contain a clear requirement of actual malice or any statutory language limiting its reach to those banks which are not considered public figures. (See, e.g., *Hufstedler, Kaus, & Ettinger v. Superior Court* (1996) 42 Cal.App.4th 55, 69–70 [49 Cal.Rptr.2d 551] [discussing whether the bank in that case was a public or private figure for purposes of libel action].) Instead,

the language of the statute allows for criminal punishment of persons making statements "untrue in fact" which are "willfully and knowingly ma[de]" without a clear requirement that the prosecutor prove defendant's knowledge of falsity or recklessness with regards to falsity.[8] (See *New York Times, supra*, 376 U.S. at p. 278 ["The state rule of law is not saved by its allowance of the defense of truth."]; see also *Garrison, supra*, 379 U.S. at p. 73 ["[E]ven where the utterance is false, the great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood."].)

Exacerbating this infirmity, the statute criminalizes the circulation of untrue "rumors." A rumor is commonly defined to be "[g]eneral talk or hearsay, not based on definite knowledge." (Oxford English Dict. <http://oed.com/search?searchType=dictionary&q=rumor&_searchBtn=Search> [as of May 29, 2012].) By its very nature, one who "transmits" or "circulates" a rumor, as opposed to one who "starts" a rumor, does not know if the information transmitted is true. Thus, Financial Code section 1327 not only fails to include a malice element required by modern defamation law, but it also criminally punishes a person who passes on a rumor ultimately determined to be factually groundless. The absence of any requirement that the person making the statement either know that it is false or, at a minimum, acted with reckless disregard of its truth or falsity, is a fundamental constitutional defect in section 1327.

### 2. *Financial Code Section 1327 Is Facially Unconstitutional Because It Is Vague*

We further conclude that Financial Code section 1327 is constitutionally defective on its face because of its vagueness. As we discuss below, section 1327, subdivision (a) is a content-based prohibition on speech that bases criminal liability on such undefined, vague concepts such as "transmit[ting] to another or others, any statement or rumor" which is untrue in fact and which is "directly *or by inference derogatory* to the financial condition" of a bank *or* "affects the solvency or *financial standing* of any bank." (Italics added.) The statute also criminally penalizes a person "who knowingly *counsels, aids, procures, or induces another to start, transmit, or circulate* any such statement or rumor . . . ." (*Ibid.*, italics added.)

The use of these broad and amorphous terms in Financial Code section 1327 raises numerous constitutional questions, including whether the statute (1)

---

[8] In supplemental briefing, the Bank claims Financial Code section 1327 contains a malice requirement because it proscribes speech that is "willfully and knowingly ma[de]." However, a reading of the statute indicates that the "willfully and knowingly" element is limited to the publication or dissemination of the statement, not to the falsity of the statement.

provides those subject to its penalties with fair notice of what type of speech may violate the statute; (2) provides adequate guidance to the numerous state officials who will be charged with interpreting and enforcing it; and (3) draws within its ambit a substantial amount of constitutionally protected speech. (See generally *Grayned v. City of Rockford* (1972) 408 U.S. 104, 108–109 [33 L.Ed.2d 222, 92 S.Ct. 2294].) The threat of criminal penalties, up to a $1,000 fine and/or one year's imprisonment, amplifies jurisprudential concern for the vagueness of the statute. (*Winters v. New York* (1948) 333 U.S. 507, 515 [92 L.Ed. 840, 68 S.Ct. 665] (*Winters*) [requiring higher "standards of certainty" for statutes imposing criminal sanctions rather than civil penalties].)

■ "A statute is fatally vague only when it exposes a potential actor to some risk or detriment without giving him fair warning of the nature of the proscribed conduct. [Citation.]" (*Rowan v. Post Office Dept.* (1970) 397 U.S. 728, 740 [25 L.Ed.2d 736, 90 S.Ct. 1484].) "[Persons] of common intelligence cannot be required to guess at the meaning of the enactment." (*Winters, supra*, 333 U.S. at p. 515, fn. omitted.) The "most important factor" in evaluating the clarity of an enactment is "whether it threatens to inhibit the exercise of constitutionally protected rights." (*Village of Hoffman Estates v. Flipside, Hoffman Estates* (1982) 455 U.S. 489, 499 [71 L.Ed.2d 362, 102 S.Ct. 1186] (*Hoffman Estates*).) Thus, "[t]he general test of vagueness applies with particular force in review of laws dealing with speech." (*Hynes v. Mayor of Oradell* (1976) 425 U.S. 610, 620 [48 L.Ed.2d 243, 96 S.Ct. 1755] (*Hynes*).) Stricter standards are required where a statute has " 'a potentially inhibiting effect on speech . . . , because the free dissemination of ideas may be the loser.' [Citations.]" (*Ibid.*, quoting *Smith v. California* (1959) 361 U.S. 147, 151 [4 L.Ed.2d 205, 80 S.Ct. 215].)

Our Supreme Court's decision in *People v. Mirmirani* (1981) 30 Cal.3d 375 [178 Cal.Rptr. 792, 636 P.2d 1130], provides an example of applying the void for vagueness doctrine in California. In that case, the court struck down a statute criminalizing threats aimed at achieving " 'social or political goals' " as unconstitutionally vague. (*Id.* at p. 388.) The court concluded the phrase " 'social or political goals' " had "no established legal meaning," and failed to "provide clear lines by which citizens, law enforcement officials, judges and juries can understand what is prohibited and what is not." (*Id.* at p. 384.)

Similarly, many of the provisions of Financial Code section 1327 at issue in this case are undefined in the law and uncertain. When is a statement "by inference derogatory to the financial condition" of a bank? How would a person know if his or her statement had the potential to "affect[] the solvency or financial standing of any bank"? As the *Mirmirani* court implored, "Surely, due process requires that criminal statutes provide more guidance to the citizens. This is particularly true when the statutes impinge upon First Amendment protections." (*People v. Mirmirani, supra*, 30 Cal.3d at p. 387.)

We cannot accept the Bank's position, echoed by amicus curiae California Bankers Association, that because of the growing number of insolvent banks, we should be especially solicitous of preventing statements "derogatory to, or [that] affect the solvency or financial standing of, a bank." Rather, it is precisely *because* of the current financial climate that we believe the public should be given broad latitude to express a wide range of viewpoints on matters relating to the operation and solvency of our financial institutions. That debate not only contributes ultimately to a proper understanding of the role and function of financial institutions in our society, but also furthers the search for solutions leading to the strengthening of the banking sector, and therefore, to our economy as a whole. Therefore, the public interest in the dissemination of this type of information is legitimate and substantial.

 "Where . . . a statute imposes a direct restriction on protected First Amendment activity, and where the defect in the statute is that the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack. [Citations.]" (*Secretary of State of Md. v. J. H. Munson Co.* (1984) 467 U.S. 947, 967–968 [81 L.Ed.2d 786, 104 S.Ct. 2839], fn. omitted (*Secretary of State*).) Because of its vague wording, journalists, politicians, and members of the general public who question the financial strength and stability of our banking system or even suggest that a bank is financially unstable, as well as any person who aids in the making or circulation of such statements, can only guess as to whether their communications will subject them to criminal liability under Financial Code section 1327. Consequently, persons "of common intelligence must necessarily guess" at whether their views on the banking system in general or, as in Rogers's case, their frustration with a particular bank will be considered an untrue "statement or *rumor*" which would "directly *or by inference*" be deemed "derogatory" to a bank's "financial condition" or whether the content of their communication will be found to "*affect*[] the solvency or financial standing of any bank." (Fin. Code, § 1327, italics added; see *Connally v. General Const. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed.2d 322, 46 S.Ct. 126].)

In our view, the most insidious aspect of Financial Code section 1327 is that because individuals cannot possibly know whether expressing their views about a financial institution will subject them to liability under the statute, as a practical matter, the safest course will be to forego expressing any opinion whatsoever about banks and financial institutions in order to avoid the personal and economic impact of a criminal conviction. (See *Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 871–872 [138 L.Ed.2d 874, 117 S.Ct. 2329].) In such a case, " 'the free dissemination of ideas may be the loser.' [Citations.]" (*Hynes, supra*, 425 U.S. at p. 620.)

### 3. *Financial Code Section 1327 Is Unconstitutionally Overbroad*

Because ambiguous statutory terminology causes citizens to " 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked," the vagueness of a statutory enactment affects our overbreadth analysis as well. (*Baggett v. Bullitt* (1964) 377 U.S. 360, 372 [84 S.Ct. 1316, 12 L.Ed.2d 377], citation omitted; see *Hoffman Estates, supra*, 455 U.S. at p. 494, fn. 6.) The overbreadth doctrine exists "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions. [Citations.]" (*Virginia v. Hicks* (2003) 539 U.S. 113, 119 [156 L.Ed.2d 148, 123 S.Ct. 2191].)

As the Bank and amicus curiae emphasize, the United States Supreme Court has consistently reiterated that false statements of fact receive no constitutional protection. (See, e.g., *BE&K Constr. Co. v. NLRB* (2002) 536 U.S. 516, 530–531 [153 L.Ed.2d 499, 122 S.Ct. 2390] [" '[F]alse statements are not immunized by the First Amendment right to freedom of speech . . . .' "]; *Bill Johnson's Restaurants, Inc. v. NLRB* (1983) 461 U.S. 731, 743 [76 L.Ed.2d 277, 103 S.Ct. 2161] [same]; *Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 52 [99 L.Ed.2d 41, 108 S.Ct. 876] ["False statements of fact are particularly valueless . . . ."].) However, a statute should be declared facially overbroad and unconstitutional if the statute punishes a "substantial" amount of protected free speech, "judged in relation to the statute's plainly legitimate sweep." (*Broadrick v. Oklahoma* (1973) 413 U.S. 601, 615 [37 L.Ed.2d 830, 93 S.Ct. 2908].)

In our case, Financial Code section 1327 has not been so carefully drawn or authoritatively construed to punish only deliberate false statements of fact. Instead, it includes within its ambit "a great variety of conduct under a general and indefinite characterization, and leaving to the executive and judicial branches too wide a discretion in its application." (*Cantwell v. Connecticut* (1940) 310 U.S. 296, 308 [84 L.Ed. 1213, 60 S.Ct. 900]; see, e.g., *Tollett, supra*, 485 F.2d at pp. 1091–1099 [statute punishing libelous, scurrilous, defamatory, or threatening statements, written on outside of envelope or postcard, stricken as unconstitutionally overbroad and vague].) Therefore, Financial Code section 1327 is unconstitutionally overbroad because it brushes constitutionally protected speech within its reach and thereby "creates an unnecessary risk of chilling free speech . . . . [Citations.]" (*Secretary of State, supra*, 467 U.S. at pp. 967–968; see *People v. Hsu* (2000) 82 Cal.App.4th 976, 982 [99 Cal.Rptr.2d 184] (*Hsu*).)

4. *Financial Code Section 1327 Is a Content-based Regulation on Speech*

Generally, "the First Amendment . . . does not countenance governmental control over the content of messages expressed by private individuals. [Citations.]" (*Turner Broadcasting System, Inc. v. FCC* (1994) 512 U.S. 622, 641–642 [129 L.Ed.2d 497, 114 S.Ct. 2445] (*Turner*).) Therefore, courts "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content. [Citations.]" (*Id.* at p. 642.) A content-based regulation is presumptively invalid (*R. A. V. v. St. Paul* (1992) 505 U.S. 377, 382 [120 L.Ed.2d 305, 112 S.Ct. 2538] (*R. A. V.*); *Best Friends Animal Society v. Macerich Westside Pavilion Property LLC* (2011) 193 Cal.App.4th 168, 185 [122 Cal.Rptr.3d 277]), and is subject to strict scrutiny review (*Hsu, supra,* 82 Cal.App.4th at p. 986). It must be demonstrated that the regulation is necessary to serve a compelling state interest and is narrowly tailored to achieve that interest. (*Ibid.; Walker v. Kiousis* (2001) 93 Cal.App.4th 1432, 1454 [114 Cal.Rptr.2d 69] (*Walker*); *Sebago, Inc. v. City of Alameda* (1989) 211 Cal.App.3d 1372, 1382 [259 Cal.Rptr. 918] (*Sebago, Inc.*).) "Laws of this sort pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion." (*Turner, supra,* 512 U.S. at p. 641.) Also, a content-based regulation on speech " ' "raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." ' [Citation.]" (*Davenport v. Washington Ed. Assn.* (2007) 551 U.S. 177, 188 [168 L.Ed.2d 71, 127 S.Ct. 2372].)

"As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based. [Citations.]" (*Turner, supra,* 512 U.S. at p. 643.) The United States Supreme Court has cited an example of a constitutionally suspect content-based regulation that has particular significance to the case before us. The court pointed out that while "the government may proscribe libel . . . it may not make the further content discrimination of proscribing *only* libel critical of the government." (*R. A. V., supra,* 505 U.S. at p. 384, original italics.) In this case, because Financial Code section 1327 punishes only *derogatory* speech about the financial condition of banks, it is a content-based regulation of speech.

The Bank, joined by amicus curiae, argues that Financial Code section 1327 is not directed at the content of the speech but, instead, is directed at the secondary effects of the speech, preventing a bank run, which subjects section 1327 to a lesser level of scrutiny. (See *Renton v. Playtime Theatres, Inc.* (1986) 475 U.S. 41, 47 [89 L.Ed.2d 29, 106 S.Ct. 925].)

However, a law that proscribes speech to prevent certain reactions from the listener is a law targeting the content of the speech rather than its secondary effects (*Boos v. Barry* (1988) 485 U.S. 312, 320 [99 L.Ed.2d 333, 108 S.Ct. 1157]), and is a content-based regulation subject to the highest level of scrutiny. (See *Walker, supra,* 93 Cal.App.4th at pp. 1453–1454; *Hsu, supra,* 82 Cal.App.4th at p. 987; *Sebago, Inc., supra,* 211 Cal.App.3d at p. 1384.)

 Financial Code section 1327 is designed to prevent the listener from having a particular reaction to the speech, withdrawing their money from the criticized financial institution, and is therefore a content-based proscription. (See *United States v. Playboy Entertainment Group, Inc.* (2000) 529 U.S. 803, 811–812 [146 L.Ed.2d 865, 120 S.Ct. 1878].) But instead of being narrowly tailored to achieve a legitimate state interest, "the defect in the statute is that the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech . . . ." (*Secretary of State, supra,* 467 U.S. at pp. 967–968.) Given our previous findings that Financial Code section 1327 is unconstitutionally vague and overbroad, the words of the statute "simply leave no room for a narrowing construction." (*Airport Comm'rs v. Jews for Jesus, Inc.* (1987) 482 U.S. 569, 575 [96 L.Ed.2d 500, 107 S.Ct. 2568].) Because this content-based restriction on speech is not narrowly tailored to achieve its goals, it is facially unconstitutional for this additional reason.[9]

### 5. Conclusion

 For the foregoing reasons, we conclude the Bank has not presented uncontroverted and conclusive evidence establishing that anything Rogers posted on Craigslist was illegal as a matter of law under Financial Code section 1327. Instead, we find section 1327 cannot be reconciled with modern constitutional requirements. It is a criminal libel statute without a malice requirement, which is designed to prohibit speech based on its content. It fails to give persons of ordinary intelligence fair notice of what is forbidden. It sets no discernible limits on what types of speech can be criminalized, and, allowing such free range, it lends itself to arbitrary enforcement. Of greatest concern, it has the potential to inhibit persons from engaging in constitution-ally protected speech about the financial soundness of our banking system by threatening those who express themselves with a less than optimistic view on this topic with criminal sanctions. Therefore, we conclude that Rogers's communications on Craigslist do not fall within the very narrow and extreme circumstances required by *Flatley* to exclude otherwise protected speech from the reach of the anti-SLAPP statute. (See *Flatley, supra,* 39 Cal.4th at p. 320.)

---

[9] In pointing out the constitutional infirmities with Financial Code section 1327, we do not question the legitimacy of the government's interest in preventing runs on our financial institutions, nor do we suggest that other legislation, carefully tailored to curb defamatory speech, may not pass constitutional muster.

C. *The Bank's Lawsuit Against Rogers Arises from Acts in Furtherance of Rogers's Constitutional Right of Free Speech in Connection with a Public Issue*

 A claim is subject to the anti-SLAPP statute if it arises from one of the four categories of protected activity set forth in section 425.16, subdivision (e). (*Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1036 [72 Cal.Rptr.3d 210].) One of these categories is section 425.16, subdivision (e)(3), which describes an " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' " as including: "(3) any written or oral statement or writing *made in a place open to the public or a public forum* in connection with *an issue of public interest*." (Italics added.)

 As to the question of whether the alleged defamatory statements were made in a place open to the public or a public forum, an Internet message board, such as "Rants and Raves" is essentially "a computerized version of a cork and pin board . . . ." (Weber, *Defining Cyberlibel: A First Amendment Limit for Libel Suits Against Individuals Arising from Computer Bulletin Board Speech* (1995) 46 Case W. Res. L.Rev. 235, 238.) After logging in to an Internet bulletin board, a person may post messages, respond to messages already posted, or simply read the discussions without posting any messages. (*Id.* at p. 239.) Without doubt, Internet message boards are places "open to the public or a public forum" for purposes of section 425.16, subdivision (e). (See *Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41, fn. 4 [51 Cal.Rptr.3d 55, 146 P.3d 510]; *D.C. v. R.R.* (2010) 182 Cal.App.4th 1190, 1226 [106 Cal.Rptr.3d 399] [Web sites accessible to the public are public forums]; *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 897 [17 Cal.Rptr.3d 497] (*Wilbanks*) [Web site is public forum]; *Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1576 [27 Cal.Rptr.3d 863] (*Ampex*) [same]; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1007 [113 Cal.Rptr.2d 625] (*ComputerXpress*) [financial Web site is public forum].)

This being so, the first-prong analysis then shifts to whether Rogers's posts were "in connection with an issue of public interest." (§ 425.16, subd. (e)(3).) The Bank claims Rogers's "false statements about [its] financial standing . . . did not concern a matter of public interest which could qualify for protection under the anti-SLAPP statute" because these statements were "a matter of interest to only Rogers himself and a very small audience."

 Section 425.16 does not define "public interest," but its preamble states that its provisions "shall be construed broadly" to safeguard "the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) Public forum comments criticizing, or even periodically praising, the performance of public corporations

have been found protected by the anti-SLAPP statute. As this appellate division has noted, "Courts have held that Internet postings about corporate activity constitute an issue of public importance upon considering the following pertinent factors: (1) whether the company is publicly traded; (2) the number of investors; and (3) whether the company has promoted itself by means of numerous press releases. [Citations.]" (*Ampex, supra,* 128 Cal.App.4th at p. 1576; accord, *ComputerXpress, supra,* 93 Cal.App.4th at p. 1006.)

With these factors in mind, Rogers adduced evidence that the Bank is a wholly owned subsidiary of Summit Bancshares, Inc., a publicly traded company with approximately 200 shareholders. The Bank has actively promoted itself on the Internet as a top-rated, financially stable bank that is a "community partner," as opposed to "just another business enterprise." It publishes its "Annual Report and Letter to Shareholders" as part of its promotional efforts highlighting its financial stability, performance and management. The Bank's chairman and chief executive officer, Shirley W. Nelson, has been the subject of media attention and was publicly acclaimed as one of the "25 Most Powerful Women in U.S. Banking" by U.S. Banker Magazine in its October 2003 issue. By disseminating this information to the general public, the Bank itself must believe the public is interested in its activities. (See, e.g., *Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 524 [44 Cal.Rptr.3d 517] ["no difficulty placing the financial survival of four hospitals within the county into the category of '*widespread* public interest' " (original italics)].)

■ Moreover, we believe the broader topic addressed in Rogers's posts—questioning the Bank's financial stability and its management decisions—concerned an "issue of public interest" within the meaning of section 425.16, subdivision (e)(3). Indeed, in the wake of the 2008 economic downturn, which ushered in widespread skepticism in the underlying financial strength of our country's financial institutions, there has been a profound public interest in the financial world, and a heightened interest in private banks. (See Holman, *A Flawed Solution: The Difficulties of Mandating a Leverage Ratio in the United States* (Mar. 2011) 84 So.Cal. L.Rev. 713, 714–715 ["While the causes of the recent financial crisis have been debated extensively, the conclusion that excessive leverage by financial institutions contributed to the crisis has garnered widespread support." (fns. omitted)].) In light of the recent financial meltdown of some of our country's largest and most trusted financial institutions, the financial stability of our banking system is a legitimate object of constitutionally protected public commentary, discussion, criticism, and opinion. (*Greenbelt Pub. Assn. v. Bresler* (1970) 398 U.S. 6, 14 [26 L.Ed.2d 6, 90 S.Ct. 1537].)

For these reasons, we reject the Bank's characterization of Rogers's posts as merely the musings of a disgruntled former employee about private

matters which are of no interest to anyone but the participants. The fact that Rogers's posts drew numerous comments, including comments vehemently disagreeing with Rogers, suggests that the broad topic of the financial stability of our banking system, and the narrow topic of the Bank and its personnel and activities, are matters of public discourse and are of considerable public interest.

Therefore, considering the exceedingly "expansive interpretation of the phrase 'issue of public interest,' and in light of the statute's mandate that we construe the law broadly so as to 'encourage continued participation in matters of public significance' (§ 425.16, subd. (a))," we conclude Rogers satisfied his burden of showing that the statements at issue here were protected under section 425.16, subdivision (e)(3). (*Thomas v. Quintero, supra*, 126 Cal.App.4th at p. 661.)

 D. *The Bank Has Failed to Establish a Probability of Prevailing on Its Claim for Defamation*

Having determined that the Bank's claims against Rogers arise from activity protected by section 425.16, and that Rogers's communications do not fall within the exception for illegal activity, we now proceed to determining whether the Bank has carried its burden of establishing that it will probably prevail on its cause of action for defamation. (§ 425.16, subd. (b)(1).)

■ To satisfy this second prong of the anti-SLAPP analysis, " ' "the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.]" [Citation.]' [Citation.] 'Thus, plaintiffs' burden as to the second prong of the anti-SLAPP test is akin to that of a party opposing a motion for summary judgment.' [Citation.] If the plaintiff fails to carry that burden, the cause of action is 'subject to being stricken under the statute.' [Citation.]" (*Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467, 1477–1478 [74 Cal.Rptr.3d 1]; accord, *Delois v. Barrett Block Partners* (2009) 177 Cal.App.4th 940, 946–947 [99 Cal.Rptr.3d 609].)

■ "Defamation consists of, among other things, a false and unprivileged publication, which has a tendency to injure a party in its occupation. [Citations.]" (*Wilbanks, supra*, 121 Cal.App.4th at p. 901.) " 'The sine qua non of recovery for defamation . . . is the existence of falsehood.' [Citation.] Because the statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability. Although statements of fact may be actionable as libel,

statements of opinion are constitutionally protected. [Citation.]" (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112 [64 Cal.Rptr.3d 467] (*McGarry*).) That does not mean that statements of opinion enjoy blanket protection. (*Ibid.*) On the contrary, where an expression of opinion implies a false assertion of fact, the opinion can constitute actionable defamation. (*Wilbanks, supra*, 121 Cal.App.4th at pp. 902–903.) ▮ The "crucial question of whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court. [Citation.]" (*Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 810 [119 Cal.Rptr.2d 108] (*Seelig*).) "Only once the court has determined that a statement is reasonably susceptible to such a defamatory interpretation does it become a question for the trier of fact whether or not it was so understood. [Citations.]" (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 647 [85 Cal.Rptr.2d 397] (*Smith*).) The question is " 'whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact. . . .' [Citation.]" (*McGarry, supra*, 154 Cal.App.4th at p. 113.)

To determine whether a statement is actionable fact or nonactionable opinion, we apply a totality of the circumstances test pursuant to which we consider both the language of the statement itself and the context in which it is made. (*McGarry, supra*, 154 Cal.App.4th at p. 113.) On the issue of context, our Supreme Court has explained: "[W]here potentially defamatory statements are published in a . . . setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion." (*Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601 [131 Cal.Rptr. 641, 552 P.2d 425].)

Initially, we point out that because Rogers's alleged defamatory statements appeared in a section of the Craigslist Web site entitled "Rants and Raves," the reader of the statements should be predisposed to view them with a certain amount of skepticism, and with an understanding that they will likely present one-sided viewpoints rather than assertions of provable facts.[10] "[A]ny reader familiar with the culture of . . . most electronic bulletin boards . . . would know that board culture encourages discussion participants to play fast and loose with facts. . . . Indeed, the very fact that most of the posters remain anonymous, or pseudonymous, is a cue to discount their

---

[10] A "rant" is typically defined as "[a]n extravagant, bombastic, or declamatory speech or utterance; (now *esp.*) a long, angry, or impassioned speech; a tirade." (Oxford English Dict. <http://oed.com/search?searchType=dictionary&q=rant&_searchBtn=Search)> [as of May 29, 2012]), while its antonym "rave" is known to be "[a]n extremely enthusiastic recommendation or appraisal; *esp.* a glowing review of a book, play, film, etc." (Oxford English Dict. <http://oed.com/view/Entry/158621?rskey=Q4S54W&result=19#eid26755840> [as of May 29, 2012].)

statements accordingly." (Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace*, 49 Duke L.J. 855, 936–937; see Comment, *Cybersmear or Cyber-SLAPP: Analyzing Defamation Suits Against Online John Does as Strategic Lawsuits Against Public Participation* (2001) 25 Seattle U. L.Rev. 213, 217 ["Posters on Yahoo! message boards often make outrageous claims" and "[m]ost visitors are completely aware of the unreliable nature of these posts."].)

 Not only commentators, but courts as well have recognized that online blogs and message boards are places where readers expect to see strongly worded opinions rather than objective facts. (See *Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1162 [72 Cal.Rptr.3d 231] (*Krinsky*) ["[t]he use of a pseudonymous screen name offers a safe outlet for the user to experiment with novel ideas, express unorthodox political views, or criticize corporate or individual behavior without fear of intimidation or reprisal"]; *Global Telemedia Internat., Inc. v. John Doe 1* (C.D.Cal. 2001) 132 F.Supp.2d 1261, 1267 (*Global Telemedia*) [finding Internet postings "are full of hyperbole, invective, short-hand phrases and language not generally found in fact-based documents, such as corporate press releases or SEC filings"].)

The main components of Rogers's posts covered the following general topics: (1) The Bank didn't pay dividends in 2009; (2) the "bitch CEO" who runs the Bank "thinks that the Bank is her personel [*sic*] Bank to do with as she pleases"; (3) the CEO should not be allowed to provide an executive position to her "worthless, lazy fat ass son"; (4) depositors should move their accounts immediately, "before its [*sic*] too late"; (5) the Bank is "screwed up," "piss poor," and a "problem Bank"; (6) the Federal Deposit Insurance Corporation (FDIC) and California's Department of Financial Institutions have "look[ed] at Summit Bank" three times in less than one year and that is "not a good thing"; (7) service was poor at the Bank's Hayward branch and the Bank closed it; (8) after the Hayward branch was closed, the customers "were left high and dry"; and (9) the Bank's depositors should leave "before they close."

Despite the Bank's invitation to do so, the law does not require Rogers to justify the literal truth of every word of the allegedly defamatory content, nor must we parse each word written by Rogers to determine its truthfulness. "It is sufficient if the defendant proves true the *substance* of the charge, irrespective of slight inaccuracy in the details, 'so long as the imputation is substantially true *so as to* justify the "gist or sting" of the remark.' [Citations.]" (*Smith, supra*, 72 Cal.App.4th at pp. 646–647.) Where an imputation is substantially true so as to justify the "gist or sting" of the remark, the truth defense is established. (*Hughes v. Hughes* (2004) 122 Cal.App.4th 931, 936 [19 Cal.Rptr.3d 247].)

Here, there is evidence that the verifiable facts in Rogers's posts were basically true. The Bank in fact paid no dividend in 2009. Regulators did in fact look at the Bank on multiple dates in 2009. The Bank, in fact, closed its Hayward branch in March 2009 and did so because it was unprofitable. In the Bank's "Letter to Our Shareholders" in 2009, it represents that "2009 proved to be the most critical, challenging and uncertain year most of us have ever imagined. It is unequivocally clear that this year has been the worst for us . . . ." The letter acknowledges that while "our profits decreased dramatically," the Bank ended the year without being "in the red," unlike a lot of other banks. At least one Web site which tracked and rated the Bank's financial health, www.weissratings.com, rated the Bank as among the "Weakest Banks and Thrifts in the U.S." with a "D+" for financial strength. The Web site claimed that institutions with a D+ rating or lower were " 'vulnerable' to future financial difficulties or even failure . . . ."

Nevertheless, the Bank claims Rogers's posts contain several statements, that when considered closely, might imply or state assertions of fact that are simply not true. For example, the Bank points to Rogers's statement that the CEO "thinks that the Bank is her personel [sic] Bank to do with it as she pleases." The Bank contends this statement is defamatory because it can reasonably be construed as implying one or more falsehoods about the CEO—for example, that the "CEO was misappropriating money and . . . those actions caused the bank not to distribute dividends . . . ." The Bank also points to Rogers's post characterizing it as a "problem Bank." The Bank proffered a declaration from a banking expert stating that a " 'Problem Bank' is a term of art in the banking industry and is defined as a financial institution with a CAMELS composite rating[] of '4' or '5'." The expert's declaration continues, that Rogers's use of the term "problem Bank" carries with it the "implication that it will likely fail in the near future and be placed into FDIC receivership." Thus, the Bank argues that this statement is demonstrably false because the Bank "was never, and is currently not, considered a 'Problem Bank' as defined above." The Bank also claims that Rogers's post "falsely represented that Rogers was a customer at [the Bank's] Hayward branch and that when it closed '[a]ll the customer [sic] were left high and dry.' " The Bank points out that Rogers was never a customer of this branch and claims that his "high and dry" statement implied "that the customers lost their money"—something that was not true.

Determining whether a particular communication is actionable can be difficult, and "what constitutes a statement of fact in one context may be treated as a statement of opinion in another, in light of the nature and content of the communication taken as a whole." (*Gregory v. McDonnell Douglas Corp., supra*, 17 Cal.3d at p. 601.) "To decide whether a statement is fact or

opinion, a court must put itself in the place of an average reader and determine the natural and probable effect of the statement, considering both the language and the context. [Citation.]" (*ComputerXpress, supra,* 93 Cal.App.4th at p. 1011.) This means that Rogers's statements must be viewed from the perspective of the average reader of an Internet site such as Craigslist's "Rants and Raves," not the Bank or a banking expert who might view them as conveying some special meaning. While the Bank is clearly sensitive to the words used by Rogers and believe they conveyed a meaning beyond that conveyed to average readers, "the fact that some person might, with extra sensitive perception, understand such a meaning cannot compel this court to establish liability at so low a threshold." (*Forsher v. Bugliosi* (1980) 26 Cal.3d 792, 805–806 [163 Cal.Rptr. 628, 608 P.2d 716].)

Moreover, the context of Rogers's posts belies the claim that anyone reading them could reasonably interpret his use of the words "problem Bank," CEO's "personel [*sic*] bank," and Bank customers left "high and dry" as implying provable assertions of fact. (*Balzaga, supra,* 173 Cal.App.4th at p. 1338 [in reviewing an alleged defamatory meaning, the context in which the statement was made must be considered].) Looking at the actual language used in Rogers's posts, it is obvious Rogers's messages are intended to be free-flowing diatribes (or "rants") in which he does not use proper spelling or grammar, and which strongly suggest that these colloquial epithets are his own unsophisticated, florid opinions about the Bank and its key personnel. This context further undermines the reader's expectation that the posts are to be understood as assertions of fact. "To put it mildly, these postings . . . lack the formality and polish typically found in documents in which a reader would expect to find facts." (*Global Telemedia, supra,* 132 F.Supp.2d at p. 1267; see *Krinsky, supra,* 159 Cal.App.4th at p. 1163 ["online discussions may look more like a vehicle for emotional catharsis than a forum for the rapid exchange of information and ideas . . ."].)

Comments that are no more than " 'rhetorical hyperbole,' 'vigorous epithet[s],' 'lusty and imaginative expression[s] of . . . contempt,' and language used 'in a loose, figurative sense' have all been accorded constitutional protection. [Citations.]" (*Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1401 [88 Cal.Rptr.2d 843]; accord, *Seelig, supra,* 97 Cal.App.4th at p. 809.) Consequently, courts have frequently found the type of name calling, exaggeration, and ridicule found in Rogers's posts to be nonactionable speech. (See, e.g., *Krinsky, supra,* 159 Cal.App.4th at pp. 1159, 1173, 1178 [in a chat room setting, anonymous post that corporate officers consisted of a "cockroach," "losers," "boobs," and "crooks" fell into the grouping of "crude, satirical hyperbole which, while reflecting the immaturity of the speaker, constitute[s] protected opinion"]; *Morningstar, Inc. v. Superior Court* (1994)

23 Cal.App.4th 676, 690–691 [29 Cal.Rptr.2d 547] [title "Lies, Damn Lies, and Fund Advertisements" nonlibelous as "simply 'imaginative expression' or 'rhetorical hyperbole,' traditionally protected under the First Amendment"]; *James v. San Jose Mercury News, Inc.* (1993) 17 Cal.App.4th 1, 12, 14 [20 Cal.Rptr.2d 890] [article describing lawyer as engaging in "sleazy, illegal, and unethical practice" fell into "protected zone of ' "imaginative expression" ' or ' "rhetorical hyperbole" ' "].)

Furthermore, Rogers's statements that the Bank was mismanaged and rendered poor service and that the Bank's depositors would be well advised to move their accounts "before its [*sic*] too late" and "before they close" do not imply a provably false factual assertion to form the basis for a defamation action. Instead, as a matter of law, such statements constitute nonactionable opinions. In *ComputerXpress, supra*, 93 Cal.App.4th 993, the court ruled similar Internet statements critical of the plaintiff company to be nonactionable opinion. The nondefamatory statements included: " 'When the people who have . . . been duped into this stock realize the scam they were coaxed into, my guess is there will be hell to pay.' " (*Id.* at p. 1013.) " 'You guys really seem to think you can sucker a lot of people all the time!' " (*Ibid.*) " '[W]ill someone please tell me why ANYONE would believe ANYTHING these guys and their pump and dump supporters say?' " (*Ibid.*) The court ruled that the "tone and substance" of such remarks identified them as statements of opinion and not of fact. (*Id.* at pp. 1012–1013.)

In so ruling, the court in *ComputerXpress* relied heavily on *Global Telemedia, supra*, 132 F.Supp.2d 1261. In *Global Telemedia* the allegedly defamatory assertions included statements that the company is " 'steering the sinking ship,' " and warnings that the company is going to " 'fly the coop,' " and that investors will be " 'screwed out of your hard earned money.' " (*Id.* at pp. 1268–1269.) The district court held that "[g]iven the tone and context of the message, a reasonable reader would not take this to be anything more than a disappointed investor who is making sarcastic cracks about the company." (*Id.* at p. 1268.)

Applying these principles here, we conclude that the statements on which the Bank's defamation claim is based are nonactionable statements of opinion, rather than verifiable statements of fact. Consequently, the Bank has not presented a prima facie case that the statements at issue, when viewed in the context of an Internet message board, are reasonably capable of a defamatory meaning or are substantially false. Because the Bank has failed to establish a probability of prevailing on its claim against Rogers for defamation, the trial court erred in denying the motion to strike.

## IV.

## DISPOSITION

The order denying the motion to strike is reversed. Upon remand, the trial court shall issue a new and different order striking the Bank's complaint and shall enter an order awarding Rogers his attorney fees and costs.

Reardon, J., and Sepulveda, J., concurred.