Filed 5/13/26  Ghost v. Wilson CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| AMANDA GHOST et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>REBEL WILSON,<br><br>    Defendant and Appellant. | B342756<br><br>(Los Angeles County<br>Super. Ct. No. 24STCV17314) |

APPEAL from an order of the Superior Court of Los Angeles County, Thomas D. Long, Judge.  Affirmed.

Liner Freedman Taitelman + Cooley, Bryan J. Freedman, Brian Turnaeur, Jacob T. Bolan; Jassy Vick Carolan, Jean-Paul Jassy, Nicholas Hartmann; Hart Kienle & Pentecost, and Allyson K. Thompson, for Defendant and Appellant.

Sheppard, Mullin, Richter & Hampton, Camille M. Vasquez, Samuel A. Moniz, Valerie E. Alter, Honieh Udenka, and Melissa Medhat Mikail, for Plaintiffs and Respondents.

————————————

Plaintiffs Amanda Ghost, Gregor Cameron, and Vince Holden filed a defamation lawsuit against defendant Rebel Wilson based on statements that Wilson made in an Instagram video and in a demand letter that Wilson allegedly shared with the press. Wilson now appeals from a trial court order denying her special motion to strike the complaint under California's anti-SLAPP statute. (Code Civ. Proc., § 425.16).[1] We affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### I. The underlying dispute and plaintiffs' lawsuit

Wilson is a prominent actress, director, and producer. Plaintiffs are film producers, and Ghost is also "an award-winning song writer and music executive . . . ."

---

[1] All subsequent undesignated statutory references are to the Code of Civil Procedure.

[2] We take our facts from the operative first amended complaint and the parties' evidence in support of and opposition to the special motion to strike. (§ 425.16, subd. (b)(2) [court "shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based"].)

We deny Wilson's July 2025 request for judicial notice of an arbitration decision relating to Ghost and media coverage of the order denying Wilson's anti-SLAPP motion. We also deny Wilson's November 2025 request for judicial notice of a special motion to strike Ghost's cross-complaint and an appellate brief filed by Ghost's attorneys in a different matter pending before this court. These documents do not affect our analysis in any way. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 687 [court may decline to take notice of irrelevant materials].)

In 2023, plaintiffs and Wilson contracted to co-produce a film called The Deb (the film). Wilson also directed and acted in the film. The film's announcement was covered in media outlets including Variety and the Hollywood Reporter.

The film was selected to premiere on the closing night of the Toronto International Film Festival (TIFF). According to BBC News, the TIFF is "widely considered the onset of the annual film awards season," and Vox has described the festival as "a bellwether for what will happen at the movies for the next six months." The film's selection to premiere at the TIFF was covered by AP News and other media outlets.

In late 2023, Wilson allegedly told "professionals and individuals in the industry" that Ghost was a "sexual harasser." Ghost declared that Wilson "spread a rumor" to the cast and crew of the film "that [Ghost] had sexually harassed or abused" the lead actress in the film, Charlotte MacInnes.

In June 2024, Wilson's counsel sent plaintiffs a demand letter asserting that Wilson had been promised a writing credit and certain rights to the music in the film. The letter demanded a compromise on these claims and threatened legal action if no resolution could be reached. The letter also claimed that Ghost and Cameron embezzled money from the film's budget, and that they sexually harassed, coerced, and held captive MacInnes. It further accused Cameron of bullying and wrongfully imprisoning Wilson.

On July 10, 2024, Wilson posted a video on Instagram in which she stated:

> " 'So you might have noticed that I did a post a couple, you know, like a week ago, about my film, the first film that I've directed that I'm so proud of The

3

Deb, which is a little Australian original musical that is so cute, and it's awesome that it got selected for closing night of the Toronto Film Festival, which is like . . . just you know, the best platform, and to be a first-time female director it's just like, I mean, it's huge. It's massive.

So to have the joy of the movie being selected is one thing. But then to have the business partners that are involved in that movie turn around and say that no, the movie can't premiere, is just beyond devastating.

Why are they saying this? Why are they stopping it from premiering at Toronto? Well, this dates back to October of last year, where I discovered bad behavior by these business partners. And let me just, you know, I just tell it how it is, so I'm just going to tell you who they are. They are so called producers of the film — I use that phrase very lightly. Their names are Amanda Ghost, and Gregory [sic] Cameron, and an executive producer who works with them called Vince Holden. So these are the people involved.

And so I said, reported, I guess you would say, their bad behavior when I found out not minor things, big things, you know, inappropriate behavior towards the lead actress of the film, embezzling funds from the film's budget, which we really needed because we're a small movie, you know? So kind of really important things.

4

Since I reported that behavior, I have been met with absolute viciousness and retaliatory behavior. So I'm there on set. I'm trying to film my movie with my gorgeous Australian cast and crew who are so amazing — shout out to all of you guys.

And yet every step of the way, these people who I complained about then tried to make my life hell. In the meantime, though, I still finished the movie. I made this great movie The Deb. And then now, you know, almost at the finish line. They're saying, you know, it can't come out. They might not release it, they might bury it. This is work of hundreds of people who have put their heart and soul into this. And this behavior is absolutely vile and disgusting. Now these people you know, Amanda Ghost in particular, has has a history of doing this kind of thing, mainly to music artists but also to people in the film business. So, the thing is, these people are forced to sign NDAs or, you know, otherwise threatened or bullied to not speak out.

As you guys know, I'm not like that. I won't be threatened. I will speak the truth, and, you know, warn people about these people in the industry. Who are just not behaving ethically. Yeah, so that's my dilemma. If the movie doesn't play at Toronto, it's because of these absolute fuckwits.' "

The statements in Wilson's video were later described or quoted in at least five media outlets, including Entertainment Weekly. The headlines conveyed that Wilson had accused plaintiffs of cancelling the film's TIFF premiere.

5

Plaintiffs sued Wilson for defamation on July 12, 2024, based on the statements in the Instagram video. The operative complaint alleged that the video falsely stated or implied that the plaintiffs sexually harassed the lead actress in the film, embezzled funds from the film, and acted inappropriately toward the lead actress in the film.

Shortly after plaintiffs' original complaint was filed, Wilson allegedly shared the demand letter with the press. Variety and other publications printed articles that included descriptions of the demand letter.

Plaintiffs amended the complaint to allege that Wilson defamed them by leaking the demand letter. According to the operative complaint, the letter falsely asserted that:

> "1) Ms. Ghost and Mr. Cameron embezzled 900,000 Australian Dollars from the Film; 2) Ms. Ghost and Mr. Cameron have a pattern and practice of embezzlement, including on other projects; 3) Ms. Ghost and Mr. Cameron sexually harassed a lead actress of the Film; 4) Ms. Ghost and Mr. Cameron maintained coercive control on a lead actress of the Film and forced her to engage in depraved sexual demands; 5) a lead actress of the Film is being held captive by Ms. Ghost and Mr. Cameron, and is being taken across state lines; 6) Mr. Cameron used physical aggression to bully Rebel, and wrongfully imprisoned her."

## II. Wilson's special motion to strike

In October 2024, Wilson filed a special motion to strike the complaint pursuant to section 425.16. The motion argued that plaintiffs' defamation claim arises from Wilson's communications

about a matter of public interest made in a public forum, and also from her conduct in furtherance of her free speech rights in connection with an issue of public interest. (§ 425.16, subd. (e)(3) & (4).) It specifically asserted that Wilson and all plaintiffs are persons in the public eye; that the statements implicated issues of public interest including the release of the film, the TIFF, sexual harassment, embezzlement, and tax fraud; and that the statements could affect a large number of people. In addition, the motion contended that the allegations based on the demand letter fell within section 425.16, subdivision (e)(2), which encompasses certain litigation activity. Finally, the motion argued that plaintiffs could not demonstrate a likelihood of prevailing on the merits.

Plaintiffs' opposition asserted that their defamation claim was based on statements and conduct relating to a private business dispute, not any public issue; and that plaintiffs were not in the public eye. It also argued that leaking the demand letter did not fall under section 425.16, subdivision (e)(2) because it did not comment on any judicial proceeding. Further, the opposition asserted that plaintiffs could establish a probability of success on their defamation claim. Wilson's reply reiterated the points raised in her motion.

The trial court denied Wilson's motion. The court recognized that sexual harassment, embezzlement, and tax fraud might be issues of public concern. However, it reasoned that the challenged statements in the Instagram video were not made in the context of any public discussion about those issues, but instead merely publicized a private business dispute. The court also rejected Wilson's assertion that the Instagram video affected a large group of people because it might impact the cast and crew

7

of the film, reasoning that the video was not part of the production process. The court recognized that the creation of the demand letter was protected activity under section 425.16, subdivision (e)(2). But it determined that transmission of the letter to the media was not protected because that act was not in furtherance of any contemplated litigation. The court therefore concluded that Wilson failed to establish that plaintiffs' claim arises from protected activity within the meaning of the anti-SLAPP statute. The court did not reach the second step of the anti-SLAPP analysis.

Wilson timely appealed.

## DISCUSSION

### I.     Legal framework and standard of review

"To combat lawsuits designed to chill the exercise of free speech and petition rights (typically known as strategic lawsuits against public participation, or SLAPPs), the Legislature has authorized a special motion to strike claims that are based on a defendant's engagement in such protected activity. (See Code Civ. Proc., § 425.16, subd. (a).)" (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1060 (*Park*).)

Section 425.16, subdivision (e), describes four categories of conduct " ' "in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" ' " which are protected by the anti-SLAPP statute. (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 620.) The categories relevant to this appeal encompass "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest" and any conduct "in furtherance of the

8

exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(3)–(4).)

The resolution of a special motion to strike involves two steps. First, the court must determine "whether the plaintiff's claims arise from protected activity." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009.) At this stage, the defendant has the burden "to identify what acts each challenged claim rests on and to show how those acts are protected under a statutorily defined category of protected activity." (*Ibid.*) If the defendant satisfies this burden, at the second step, "for each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit." ' " (*Ibid.*)

Our review is de novo. (*Park*, *supra*, 2 Cal.5th at p. 1067.) "We exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity." (*Ibid.*) We "shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) We do not "weigh the evidence, but accept plaintiff's submissions as true and consider only whether any contrary evidence from the defendant establishes its entitlement to prevail as a matter of law." (*Park*, at p. 1067.)

## II. Plaintiffs' defamation claim arises from protected activity

Wilson argues that plaintiffs' defamation claim arises from a "written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest," and also from Wilson's conduct "in furtherance of the exercise of . . . the constitutional right of free speech in connection

9

with a public issue or an issue of public interest." (§ 425.16, subd. (e)(3) & (4).) Plaintiffs do not dispute that the statements posted to Instagram were made in a public forum. (*Id.*, subd. (e)(3); *Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1252 [Facebook and Instagram posts were made on a public forum].) They also do not contest that sharing the demand letter with the press was an act in furtherance of Wilson's free speech rights. (§ 425.16, subd. (e)(4).)

However, the parties disagree as to whether Wilson's statements and conduct were in connection with a public issue. In assessing this question, "courts look to certain specific considerations, such as whether the subject of the speech or activity . . . 'occur[red] in the context of an ongoing controversy, dispute or discussion' [citation] . . . ." (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 145–146 (*FilmOn*).)[3] We use a two-step analysis. "First, we ask what 'public issue or . . . issue of public interest' the speech in question implicates— a question we answer by looking to the content of the speech. [Citation.] Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest." (*Id.* at pp. 149–150.)

At the first part of the *FilmOn* analysis, "virtually always, defendants succeed in drawing a line—however tenuous— connecting their speech to an abstract issue of public interest."

---

[3]    A statement is also connected to a public issue if it concerns " 'a person or entity in the public eye' . . . ." (*FilmOn, supra*, 7 Cal.5th at pp. 145–146.) Because we conclude that plaintiffs' defamation claim relates to a public issue, we need not resolve the parties' dispute as to whether the claim also concerns persons in the public eye.

10

(*FilmOn*, *supra*, 7 Cal.5th at p. 150.) The Instagram video and the demand letter both broadly relate to the creation and production of the film. And Wilson provided evidence that the film and its selection to premiere at the TIFF were covered in the media, which establishes that both topics are of demonstrated public interest. (Cf. *Kronemyer v. Internet Movie Database Inc.* (2007) 150 Cal.App.4th 941, 949 [successful film My Big Fat Greek Wedding was of public interest].) The fact that the video and the demand letter also described a private dispute between Wilson and plaintiffs does not alter this conclusion, because "*FilmOn*'s first step is satisfied so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public issue, even if it also implicates a private dispute." (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1253 (*Geiser*).)

At the second part of the *FilmOn* analysis, we consider both "the content of the challenged statements" and "the broader context" in which the statements were made to assess whether the statements "further[ed] [the] public conversation on an issue of public interest." (*FilmOn*, *supra*, 7 Cal.5th at pp. 152–153.) We assess the second part of the analysis through the lens of the public issues identified in the first part. (*Geiser*, *supra*, 13 Cal.5th at p. 1250.)

Wilson's statements in the Instagram video contributed to the public discourse on the film and its planned premiere at the TIFF. As we have noted, the film was discussed by major media outlets, as was its selection to premiere at the TIFF. The Instagram video focused primarily on these topics. Wilson began the video by stating that she had directed a film. She noted that the film was chosen to premiere at the TIFF, an honor that she

11

described as "huge" and "massive." Wilson then disclosed that plaintiffs told her that "the movie can't premiere." And she explained why: Wilson discovered and reported certain misconduct, and plaintiffs retaliated against her by threatening to "bury" the movie. Wilson concluded the video by stating, "[i]f the movie doesn't play at Toronto, it's because of" plaintiffs. In short, the primary purpose of the video was to announce a significant development, and further public discourse, about the release of the film—that it might not premiere at the TIFF.

The leaked demand letter also contributed to the public discourse on this issue. Wilson posted the Instagram video on July 10, 2024, and just two days later, Variety reported that it had obtained the demand letter. The accusations in the letter align with, and provide additional detail about, the accusations in the Instagram video. Thus, considering "the broader context" of the Instagram video and the leaked demand letter, we conclude that all of the challenged statements "further[ed] [the] public conversation on an issue of public interest." (*FilmOn, supra*, 7 Cal.5th at pp. 152–153.)

The media coverage of the Instagram video and the demand letter further supports our conclusion. According to the complaint, five articles covered the Instagram video, and the headlines highlighted Wilson's assertion that plaintiffs had threatened to stop the film from premiering at the TIFF. And Variety published an article covering both the demand letter and the earlier Instagram video, and describing both as accusing plaintiffs of misconduct. "[W]hen the conduct that gives rise to a lawsuit attracts such media attention, it can be an indicator that

12

such conduct was undertaken 'in connection with' a public issue." (*Geiser*, *supra*, 13 Cal.5th at p. 1255.)[4]

Plaintiffs argue that the statements in the Instagram video and the demand letter are disconnected from any matter of public concern because the public had previously expressed no interest in the film's finances or its producers. By focusing on one aspect of the video, plaintiffs improperly ignore the larger context. As we have explained, Wilson began and ended her video by announcing that the film might not premiere at the TIFF. And the demand letter provided further context for the dispute that led to this potential cancellation. It is true that Wilson's statements also described a private dispute between Wilson and the producers of the film, which in part related to the film's finances. But considering "the broader context," including subsequent media coverage focusing on the public consequences of the parties' private dispute, we conclude that Wilson's statements "further[ed] [the] public conversation on an issue of public interest." (*FilmOn*, *supra*, 7 Cal.5th at pp. 152–153.)[5] In sum, all of the conduct underlying plaintiffs' defamation claim is protected activity within the meaning of the anti-SLAPP statute.

---

[4] Because we conclude that the leaked demand letter is protected activity with the meaning of section 425.16, subdivision (e)(3), we need not consider whether it is also protected litigation activity under section 425.16, subdivision (e)(2).

[5] Because we conclude that Wilson's statements furthered public discourse about the film and the TIFF premiere, we need not address whether they also contributed to a public conversation on sexual harassment, embezzlement, or fraud.

## III. Plaintiffs have demonstrated a likelihood of success

Although the trial court did not reach the second step of the special motion to strike analysis, the parties have fully briefed the issue, and we may address it de novo. (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 468.) We elect to do so here. We conclude that plaintiffs have demonstrated a likelihood of success on their defamation claim.[6]

### A. *Applicable law and standard of review*

At the second step of the special motion to strike analysis, plaintiffs " 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291 (*Soukup*).) The court must " 'accept as true the evidence favorable to the plaintiff . . . .' [Citation.] The plaintiff need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP." (*Ibid.*)

Plaintiffs' complaint included a single claim for defamation. "The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.' [Citation.]" (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.) Additionally, "[t]o prevail on a cause of action for defamation, a plaintiff who is a public figure must prove the defendant intentionally published a false statement of fact with actual malice," i.e., with knowledge or

---

[6] Accordingly, we need not address plaintiffs' request that we remand for reconsideration of plaintiffs' discovery motion, which is contingent on this court reversing at prong two.

reckless disregard of falsity. (*OneTaste Inc. v. Netflix, Inc.* (2025) 116 Cal.App.5th 174, 188 (*OneTaste*).)

Plaintiffs argue, and Wilson does not dispute, that the statements at issue were published. Wilson also does not contest that the statements were defamatory and had a natural tendency to injure plaintiffs. But the parties dispute whether the statements in the Instagram video constitute nonactionable opinion, whether leaking the demand letter to the press was a privileged act, and whether plaintiffs submitted sufficient evidence of falsity. Additionally, the parties dispute whether plaintiffs are public figures and, if they are, whether they established that Wilson acted with actual malice. We address each issue in turn.

### B.    *Wilson's statements in the Instagram video are provably false*

Wilson first argues that the statements in the Instagram video are not actionable because they are not provably false. Indeed, " '[t]he *sine qua non* of recovery for defamation . . . is the existence of a falsehood.' " (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 259 (*Baker*).) Thus, statements of opinion are generally not actionable, unless such statements imply a false assertion of fact. (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 289 (*Hawran*).) Relatedly, statements "that are no more than ' "rhetorical hyperbole," "vigorous epithet[s]," "lusty and imaginative expression[s] of . . . contempt," and language used "in a loose, figurative sense" have all been accorded constitutional protection. [Citations.]' " (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 699 (*Summit Bank*).)

"We apply a ' "totality of the circumstances' " test to determine both whether (a) a statement is fact or opinion, and (b)

15

a statement declares or implies a provably false factual assertion; that is, courts look to the words of the statement itself and the context in which the statement was made." (*Hawran*, *supra*, 209 Cal.App.4th at p. 289.) We first examine the language of the statement, then the context in which it was made. (*Ibid*.) "[W]hether the statement at issue was a statement of fact or a statement of opinion . . . is a question of law to be decided by the court." (*Baker*, *supra*, 42 Cal.3d at p. 260.)

In the Instagram video, Wilson stated that she discovered plaintiffs' "inappropriate behavior towards the lead actress of the film." Wilson argues that this phrase is not provably false. She also contends that it does not fairly imply, as the complaint alleged, that plaintiffs sexually harassed that actress. In a vacuum, the phrase "inappropriate behavior" is subjective— conduct that one person finds inappropriate might be perfectly acceptable to another person. (Cf. *McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 117 (*McGarry*) ["immoral behavior" not provably false].) But we agree with plaintiffs that this phrase, considered in context, implies sexual harassment. Specifically, Ghost declared that before Wilson posted the Instagram video, Wilson "spread a rumor" to the cast and crew of the film that Ghost had sexually harassed MacInnes. And just two days after the Instagram video was posted, Wilson allegedly shared with the media a demand letter that also accused Ghost of sexually harassing MacInnes. Therefore, at least some people who viewed the Instagram video would have had prior knowledge that Wilson had accused Ghost of sexual harassment. Additionally, Wilson's own briefing cites a Hollywood Reporter article describing a survey finding that sexual harassment is pervasive in the film industry as of September 2024, just three

16

months after Wilson posted the Instagram video. Those familiar with or inside the industry would understand an accusation of inappropriate behavior toward an actress to connote such harassment. Based on the totality of the circumstances, we conclude that the term inappropriate behavior implied that plaintiffs engaged in sexual harassment, which is provably false. (*Hawran*, *supra*, 209 Cal.App.4th at p. 289.)

Wilson cites several decisions to support her argument that an accusation of inappropriate behavior is non-actionable opinion. (*Hoang v. Tran* (2021) 60 Cal.App.5th 513, 533 [" 'inappropriately "used" a girl . . . to promote his businesses' " was mere opinion]; *McGarry*, *supra*, 154 Cal.App.4th at p. 106 ["implied accusation that [plaintiff] had committed unspecified immoral acts" not provably false]; *James v. San Jose Mercury News, Inc.* (1993) 17 Cal.App.4th 1, 14 [" 'sleazy' " was mere opinion]; *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1540–1542, 1553 [describing hand holding and thigh touching as inappropriate did not imply sexual relationship].) Yet, none of these cases involved prior accusations of sexual harassment that contextualize the meaning of an otherwise ambiguous statement. Nor did any of the cases involve the film industry, which Wilson asserts is pervaded by sexual harassment. As we have discussed, these circumstances are part of the overall context that we must consider.

Wilson's statement that she discovered plaintiffs "embezzling funds from the film's budget" is also sufficiently factual. The statement conveys that plaintiffs improperly took money that did not belong to them. The video also specified that plaintiffs took the funds from the film's budget. Whether plaintiffs improperly took money from that source can be

17

objectively proven or disproven. And, Wilson asserted in the video that she directed the film. A reasonable viewer would infer that Wilson, as the director, had access to financial records that could support her accusation. Thus, even if the assertion that plaintiffs embezzled funds was not provably false, the statement at least implies a provably false factual assertion. (*Hawran*, *supra*, 209 Cal.App.4th at p. 289.)

The cases Wilson cites on this point are distinguishable. In *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, the defendant posted comments on a website accusing the plaintiff of fraud and deceit. (*Id*. at p. 1142.) The reviewing court found that the statements were not actionable, in part because they were "generalized in that they lack any specificity as to the time or place" of those acts. (*Id*. at p. 1149.) While Wilson did not identify the time or place of any act, she accused plaintiffs of embezzling from a specific source—the film's budget. And since the video identified plaintiffs as the film's producers, a reasonable viewer could infer that plaintiffs would have the opportunity to siphon money from the budget. These specifics differentiate this case from *Chaker*.

*Summit Bank* is also distinguishable. There, a bank sued its former employee for posting derogatory statements on the " 'Rants and Raves' " section of Craigslist.org. (*Summit Bank*, *supra*, 206 Cal.App.4th at pp. 696–697.) Among other things, the employee said that "depositors should move their accounts immediately, 'before its [*sic*] too late,' " and that "the Bank's depositors should leave 'before they close.' " (*Id*. at p. 697.) The appellate court concluded that the statements were not actionable, reasoning that the audience for the " 'Rants and Raves' " posts "should be predisposed to view [such posts] with a

18

certain amount of skepticism, and with an understanding that they will likely present one-sided viewpoints rather than assertions of provable facts." (*Id*. at pp. 696, 700.) Unlike in *Summit Bank*, Wilson's video was not posted to a forum specifically designed to host hyperbolic rants, and Wilson has not identified anything about the Instagram platform that would lead viewers to treat her statements with skepticism.

For this same reason, we also find distinguishable *Obsidian Finance Group, LLC v. Cox* (9th Cir. 2014) 740 F.3d 1284. There, a blogger posted messages online accusing plaintiff Obsidian of " 'illegal activity,' including 'corruption,' 'fraud,' 'deceit on the government,' 'money laundering,' 'defamation,' 'harassment,' 'tax crimes,' and 'fraud against the government.' " (*Id*. at p. 1293.) The messages were posted on "obsidianfinancesucks.com," which the court reasoned would convey to readers that the statements should be viewed with skepticism. (*Ibid*.) As we have discussed, Wilson's statement was posted to Instagram, a neutral platform, and there is no indication that viewers should have viewed Wilson's statements with caution.

Finally, Wilson asserts that the court in *Nicosia v. De Rooy* (N.D. Cal. 1999) 72 F.Supp.2d 1093 found that accusations of embezzlement were protected under circumstances similar to this case. Not so. The court concluded that an embezzlement accusation was not actionable because the speaker also disclosed the underlying facts. (*Id*. at p. 1103 ["Accusations of criminal activity, like other statements, are not actionable if the underlying facts are disclosed."].) Wilson's video did not include any similar disclosure.

19

### C. There is a triable fact dispute as to the source of the demand letter leak

Wilson also argues that she did not leak the demand letter to the press, and therefore she cannot be held liable for any defamatory statements therein. Wilson and her counsel filed declarations averring that they did not leak the letter. But plaintiffs also declared that they did not share the letter with the press. Because the source of the leak is disputed, we credit plaintiffs' declarations and defer resolution of this question to the factfinder. (*Soukup*, *supra*, 39 Cal.4th at p. 291 [court must " 'accept as true the evidence favorable to the plaintiff' "]; *Litinsky v. Kaplan* (2019) 40 Cal.App.5th 970, 982 [court may not resolve disputed fact issues in resolving anti-SLAPP motion].)

### D. The demand letter is not protected by the fair report privilege

Next, Wilson contends that plaintiffs cannot state a claim for defamation based on the allegedly leaked demand letter because of the fair report privilege. (Civ. Code, § 47, subd. (d).) We do not agree.

"The fair report privilege 'confers an absolute privilege on any fair and true report in, or a communication to, a public journal of a judicial proceeding, or anything said in the course thereof.' " (*Healthsmart Pacific, Inc. v. Kabateck* (2016) 7 Cal.App.5th 416, 431.) Whether the privilege applies is a question of law for the court to decide. (*Ibid*.) "Although the fair report privilege is typically invoked by news media defendants, it also protects those who communicate information to the media." (*Ibid.*, italics omitted.) However, even for communications to the media, the privilege protects only descriptions or statements

20

made in the course of judicial proceedings, commencing with the filing of a complaint. (*Id.* at p. 432.) Here, the demand letter was prepared and sent to plaintiffs one month before plaintiffs filed suit against Wilson. Because the letter was created before any litigation had commenced, it does not describe any judicial proceeding or anything said in the course of such a proceeding. (Cf. *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1144, fn. 3 [in dicta, reasoning that Civil Code section 47, subdivision (d) does not apply to statements made in anticipation of litigation].)

Wilson correctly notes that the litigation privilege found in Civil Code section 47, subdivision (b) protects prelitigation activity. (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251.) In the context of this case, Wilson's act of sending the demand letter to plaintiffs was very likely protected by the litigation privilege. But Wilson has identified no legal authority or reasoned argument supporting the proposition that the fair and true report privilege protects the disclosure of that letter to the press.

### E. *Plaintiffs have established a prima facie case of falsity*

Having concluded that all of the statements at issue are actionable and not privileged, we next consider whether plaintiffs have made a prima facie showing that the statements were false. (*Soukup*, *supra*, 39 Cal.4th at p. 291.) We conclude that plaintiffs met this burden.

In the Instagram video, Wilson asserted that plaintiffs acted inappropriately toward MacInnes and embezzled from the film's budget. And in the demand letter, Wilson accused Ghost and Cameron of embezzling from the film's budget and from past projects; and of sexually harassing, coercively controlling, and

21

holding captive MacInnes. The demand letter also asserted that Cameron physically bullied and wrongfully imprisoned Wilson. Plaintiffs submitted declarations averring that these accusations are all false. MacInnes also declared that the statements relating to her are untrue. We must credit these declarations, and we conclude that they are sufficient to establish a prima facie case of falsity. (*Soukup*, *supra*, 39 Cal.4th at p. 291 [court must " 'accept as true the evidence favorable to the plaintiff' "]; *Mitchell v. Twin Galaxies, LLC* (2021) 70 Cal.App.5th 207, 219 [plaintiff's declarations supported prima facie showing of falsity].)

Wilson argues that there is insufficient evidence that the statements relating to MacInnes were false, citing an email from MacInnes's agent describing an interaction between Ghost and MacInnes that Wilson believed to be inappropriate. But as we have discussed, MacInnes herself declared that Wilson's accusations are not true. At this stage, we credit that declaration. (*Soukup*, *supra*, 39 Cal.4th at p. 291.)

Wilson also asserts that plaintiffs failed to demonstrate that they did not actually embezzle funds from the film. She focuses on a single email in which Cameron asked another producer to make certain adjustments to the film's budget. According to Wilson, these adjustments "diverted AU$900,000 from the film's budget" to plaintiffs. But the email is merely a request, and Wilson has not cited any evidence that the proposed changes were ever implemented. And even assuming that the adjustments were made, Wilson has not established that the changes were improper or not permitted under the relevant contracts. Moreover, Wilson's briefing completely ignores plaintiffs' declarations, which expressly aver that no embezzlement occurred. As we have discussed, at this stage of

22

the proceedings, those declarations are sufficient to support a prima facie showing of falsity. The parties may explore the nuances of the film's budget as the case proceeds.

### F. *Plaintiffs have provided sufficient evidence of actual malice*

In a defamation case, a plaintiff who is a public figure must plead and provide evidence that the defendant acted with actual malice. (*OneTaste*, *supra*, 116 Cal.App.5th at p. 188.) Wilson argues that plaintiffs are public figures; plaintiffs assert that they are not. We need not resolve this dispute. Even assuming that plaintiffs are public figures, we conclude that they pleaded and made a prima facie showing of actual malice.

" 'Actual malice . . . requires at a minimum that the statements were made with a reckless disregard for the truth. And although the concept of "reckless disregard" "cannot be fully encompassed in one infallible definition," [citation], we have made clear that the defendant must have made the false publication with a "high degree of awareness of . . . probable falsity," [citation], or must have "entertained serious doubts as to the truth of his publication," [citation].' " (*Young v. CBS Broadcasting, Inc.* (2012) 212 Cal.App.4th 551, 562–563 (*Young*).) Malice cannot be inferred from ill will alone, but "anger and hostility toward the plaintiff [citation], . . . may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication." (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 258 (*Reader's Digest*).)

Actual malice must be established by clear and convincing evidence. "Accordingly, to defeat a special motion to strike a defamation claim, a public figure plaintiff must demonstrate a

23

probability that it can produce clear and convincing evidence of actual malice." (*OneTaste*, *supra*, 116 Cal.App.5th at p. 188.)

Here, Wilson accused plaintiffs of acting inappropriately towards, sexually harassing, coercing, and imprisoning MacInnes. MacInnes submitted a declaration averring that these statements are not true. More importantly, MacInnes declared that she told Wilson twice in late 2023—several months before the Instagram video was posted—that MacInnes did not feel harassed by Ghost, and that she felt "completely comfortable" around Ghost "at all times." This evidence supports that Wilson knew, or had reason to believe, that her statements about MacInnes were likely untrue. (*Young*, *supra*, 212 Cal.App.4th at p. 563.)

Wilson also accused plaintiffs of embezzlement, and specifically accused them of taking $900,000 from the film's budget. As noted *ante*, Wilson points to email in which Cameron asked another producer to make certain adjustments to the film's budget. But plaintiffs submitted evidence that Wilson was involved in contract and fee negotiations relating to the film. Therefore, assuming plaintiffs can prove that any changes to the budget were consistent with the relevant contracts, Wilson would have known that her statement was false. And even if Wilson was uncertain, at minimum, she had the ability to confirm whether any changes to the budget were consistent with the contracts and, in turn, whether her statements were false. (*Harte-Hanks Communications, Inc. v. Connaughton* (1989) 491 U.S. 657, 683–684, 692 ["purposeful avoidance of the truth" by failing to listen to available tapes that would have disproved defamatory statement supported finding of actual malice].)

24

In the demand letter, Wilson also accused Cameron of bullying and wrongfully imprisoning her. Cameron declared that this is "categorically false." If Cameron is correct—and we must accept his declaration as true—then Wilson knows that this accusation is untrue.

Finally, Wilson's statements appear to be at least partially motivated by hostility toward plaintiffs. In the Instagram video, Wilson accused plaintiffs of "vicious[]" and "vile and disgusting" behavior, and called them "absolute fuckwits." The demand letter similarly describes plaintiffs' conduct as "vile" and "selfish." While not dispositive, this "anger and hostility" further supports that Wilson may have had "serious doubts regarding the truth" of her statements. (*Reader's Digest*, *supra*, 37 Cal.3d at p. 258.) Overall, plaintiffs have established a probability they can prove by clear and convincing evidence that Wilson made the statements at issue with actual malice. (*OneTaste*, *supra*, 116 Cal.App.5th at p. 188.)

## DISPOSITION

We affirm the order denying Wilson's special motion to strike.  Plaintiffs are awarded their appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


HANASONO, J.


We concur:


EDMON, P. J.


EGERTON, J.